NO. 21-12618

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FRANK CHANDLER, *et al.*,

*Plaintiffs-Appellants*

v.

GLENMARK PHARMACEUTICALS, INC. USA, *et al.*,

*Defendants-Appellees*

On Appeal from the United States District Court
for the Southern District of Florida
MDL No. 2924

## GENERIC-ONLY PLAINTIFFS-APPELLANTS' OPENING BRIEF

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Blvd, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270
gilbert@kolawyers.com

Ashley Keller
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5222
ack@kellerpostman.com

Noah Heinz
KELLER POSTMAN LLC
1101 Connecticut Ave., NW, Suite 1100
Washington, DC 20036
noah.heinz@kellerpostman.com

April 10, 2024

*Counsel for Plaintiffs-Appellants*

No. 21-12618
*Chandler v. Glenmark Pharmaceuticals, Inc. USA*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Plaintiffs-Appellants

hereby certifies that the previously filed certificate remains correct.


Dated: April 10, 2024                    Respectfully submitted,


                                         /s/ *Ashley Keller*
                                         Ashley Keller
                                         KELLER POSTMAN LLC
                                         150 N. Riverside Plaza, Suite 4100
                                         Chicago, IL  60606
                                         Tel: (312) 741-5220

                                         *Counsel for Plaintiffs-Appellants*

**STATEMENT REGARDING ORAL ARGUMENT**

Generic-Only Appellants respectfully request oral argument because this appeal turns on a question of first impression involving the application of fundamental preemption principles to a complex statutory and regulatory regime. Oral argument would assist the Court in clarifying and testing the parties' arguments.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS..................................................................................... ii

TABLE OF AUTHORITIES ................................................................................v

STATEMENT OF JURISDICTION.................................................................. xii

INTRODUCTION ..............................................................................................1

STATEMENT OF THE ISSUES........................................................................4

      A.     Factual Background..........................................................................5

            1.     Ranitidine degrades into carcinogenic NDMA..........................5

            2.     Defendants knew or should have known about ranitidine's dangers decades sooner. ........................................7

      B.     Legal Background for Generic Drugs. ..................................................8

            1.     Selling pharmaceuticals is only lawful with FDA approval...................................................................................8

            2.     Congress made pharmaceutical manufacturers and sellers responsible for patient safety. ..................................9

      C.     The District Court Dismissed All Claims Against Generic Defendants............................................................................................12

            1.     The district court dismissed claims in the MPIC.....................12

            2.     The district court dismissed claims in the AMPIC. .................14

SUMMARY OF ARGUMENT ........................................................................18

I.     The District Court Lacked Subject-Matter Jurisdiction Because The Parties Are Not Completely Diverse. .........................................................19

      A.     The Actions Were Merged. .................................................................19

B.     If the Actions Merged, There Is No Jurisdiction. ...............................25

C.     The Arguments Supporting Jurisdiction Are Unavailing. ..................26

II.     The District Court Erred In Holding That Impossibility Preemption Bars State-Law Claims In The MPIC That Parallel Federal Law. .......................27

A.     Fundamental Preemption Principles Preserve Parallel Duties. ...........28

1.     The basic logic of conflict preemption always preserves parallel state law duties. ...........................................................28

2.     The original public meaning of the supremacy clause confirms that parallel state duties cannot conflict with federal law. ...................................................................................31

B.     The Federal and State Law Duties Here Are Parallel. .......................33

1.     Ranitidine is illegal to sell under federal law. ..........................34

2.     Ranitidine is illegal to sell under state law. ..............................36

C.     FDCA Precedent Is Fully Consistent With The Parallel Claims Theory ...............................................................................................38

D.     The District Court's Reasoning Is Flawed. .........................................41

III.     The FDCA Does Not Preempt The Amended Claims Because They Rest On State Law Requirements That Defendants Could Have Fulfilled. ..........44

A.     Because Complying With The Specific Duties Alleged Was Possible, Impossibility Preemption Does Not Bar Any AMPIC Claim. .................................................................................................45

1.     Under impossibility preemption, whenever a defendant can take some action to comply with a state law duty, it can be liable for failing to take that specific action. .................45

2.     Defendants could have satisfied each duty plaintiffs alleged. .....................................................................................47

B.     The District Court's Holding That Preemption Applies Whenever *Any* Duty Is Impossible to Satisfy Is Erroneous. ...............52

     C.     Generic Defendants Could Have Warned Through FDA. ..................54

CONCLUSION .......................................................................................58

CERTIFICATE OF COMPLIANCE.........................................................59

CERTIFICATE OF SERVICE .................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acetaminophen-ASD-ADHD Prod. Liab. Litig.*,

    No. 22-MC-3043, ECF No. 1408 (S.D.N.Y. Feb. 16, 2024)..............................24

*Arizona v. United States*,

    567 U.S. 387 (2012).........................................................................29

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009)...................................................................36, 43

*Aubin v. Union Carbide Corp.*,

    177 So. 3d 489 (Fla. 2015) ..............................................................37

*Bank of Augusta v. Earle*,

    38 U.S. 519 (1839).........................................................................31

\* *Bates v. Dow Agrosciences LLC*,

    544 U.S. 431 (2005).................................... 14, 29, 30, 37, 38, 41, 42

*Bausch v. Stryker Corp.*,

    630 F.3d 546 (7th Cir. 2010) ..........................................................30

*Boyes v. Shell Oil Prods. Co.*,

    199 F.3d 1260 (11th Cir. 2000) ......................................................45

*Boyle v. United Tech. Corp.*,

    487 U.S. 500 (1988) .................................................................. 46, 53

*Buckman Co. v. Pls.' Legal Comm.*,

    531 U.S. 341 (2001) .......................................................................... 56

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,

    479 U.S. 272 (1987) .......................................................................... 44

\* *Carson v. Monsanto Co.*,

    92 F.4th 980 (11th Cir. 2024) .............................................. 33, 34, 37

*Chaparro v. Carnival Corp.*,

    693 F.3d 1333 (11th Cir. 2012) ......................................................... 18

\* *Cliff v. Payco Gen. Am. Credits, Inc.*,

    363 F.3d 1113 (11th Cir. 2004) ................................................... 45, 46

*Coleman v. Medtronic, Inc.*,

    223 Cal. App. 4th 413 (Feb. 3, 2014), *ordered published* 331 P.3d

    178 (Cal. 2014) ......................................................................... 54, 55

*Crosby v. Nat'l Foreign Trade Council*,

    530 U.S. 363 (2000) .......................................................................... 44

*In re Denture Cream Prod. Liab. Litig.*,

    204 F. Supp. 3d 1348 (S.D. Fla. 2016) .............................................. 24

vi

*English v. Gen. Elec. Co.*,

    496 U.S. 72 (1990) ....................................................................... 30, 44

*FDA v. Brown & Williamson Tobacco Corp.*,

    529 U.S. 120 (2000) ............................................................................. 8

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,

    505 U.S. 88 (1992) ............................................................................. 28

*Gamble v. United States*,

    587 U.S. 678 (2021) ........................................................................... 31

*Glover v. Bausch & Lomb, Inc.*,

    275 A.3d 168 (Conn. 2022) ............................................................... 55

*Graham v. R.J. Reynolds Tobacco Co.*,

    857 F.3d 1169 (11th Cir. 2017) (en banc) ......................................... 18

*Hayburn's Case*,

    2 U.S. (Dall.) 408 (1792) .................................................................. 20

*Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*,

    471 U.S. 707 (1985) ........................................................................... 44

*Hughes v. Boston Sci. Corp.*,

    631 F.3d 762 (5th Cir. 2011) ............................................................ 30

*Ingram v. CSX Transp., Inc.*,

    146 F.3d 858 (11th Cir. 1998) .......................................................... 27

*Maryland v. Louisiana*,

    451 U.S. 725 (1981)..................................................................44

*McCulloch v. Maryland*,

    17 U.S. 316 (1819)...................................................................32

*Medtronic, Inc. v. Lohr*,

    518 U.S. 470 (1996)..................................................14, 29, 41, 42

*Merck Sharp & Dohme Corp. v. Albrecht*,

    587 U.S. 299 (2019)..................................................................30

*Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*,

    467 U.S. 461 (1984)..................................................................44

*Mink v. Smith & Nephew Inc.*,

    860 F.3d 1319 (11th Cir. 2017) .............................................30, 57

*Mize v. Mentor Worldwide LLC*,

    51 Cal. App. 5th 850 (2020) ..................................................54

\* *Mutual Pharm. Co. v. Bartlett*,

    570 U.S. 472 (2013) .........................2, 3, 8, 12, 13, 28, 36, 38, 39-43

*PLIVA, Inc. v. Mensing*,

    564 U.S. 604 (2011)....................................... 13, 33, 38, 39, 43, 47, 52

*Reyes v. Wyeth Lab'ys*,

    498 F.2d 1264 (5th Cir. 1974) .........................................................37

＊ *Riegel v. Medtronic, Inc.*,

   552 U.S. 312 (2008)........................................................14, 41, 42, 46

*Silkwood v. Kerr-McGee Corp.*,

   464 U.S. 238 (1984)........................................................44

*Stengel v. Medtronic Inc.*,

   704 F.3d 1224 (9th Cir. 2013) (en banc) .......................................30, 56

*United States v. Dotterweich*,

   320 U.S. 277 (1943)........................................................11

*Wis. Pub. Intervenor v. Mortier*,

   501 U.S. 597 (1991)........................................................44

＊ *Wyeth v. Levine*,

   555 U.S. 555 (2009)........................................................10, 12, 33, 42

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,

   437 F. Supp. 3d 1368 (J.P.M.L. 2020) ...........................................12

＊ *In re Zantac (Ranitidine) Prod. Liab. Litig.*,

   No. 21-10305, 2022 WL 16729151 (11th Cir. Nov. 7, 2022)...............20, 22, 24

**Statutes**

7 U.S.C. §136v(b) ...........................................................29, 42

21 U.S.C. §331 ............................................................10

21 U.S.C. §331(a) ..........................................................13

21 U.S.C. §331(b) ...................................................................13

21 U.S.C. §331(c) ...................................................................13

21 U.S.C. §331(d) ...................................................................13

21 U.S.C. §333 .......................................................................10

21 U.S.C. §334 .....................................................................6, 10

\* 21 U.S.C. §352(a)(1) ........................................................9, 10, 42

\* 21 U.S.C. §352(j) ................................. 2, 9, 10, 12, 13, 35, 42

21 U.S.C. §352(p) ...............................................................9, 10

21 U.S.C. §355(a) .....................................................................8

21 U.S.C. §355(d) .....................................................................8

21 U.S.C. §355(j) ......................................................................9

21 U.S.C. §355(j)(2)(A)(v) ......................................................38

21 U.S.C. §355(j)(4)(G) ...........................................................38

21 U.S.C. §360k(a)(1) ..............................................................42

28 U.S.C. §1291 .......................................................................xi

28 U.S.C. §1332 .......................................................................xi

Federal Food, Drug, and Cosmetic Act 21 U.S.C. §301 *et seq.* ................................8

**Regulations**

21 C.F.R. §211.166(a) ..............................................................51

21 C.F.R. §314.70 .....................................................................9

21 C.F.R. §314.94(a)(8)(iv) ...............................................................47, 50

21 C.F.R. §314.170 ...........................................................................10

*New Drug and Antibiotic Regulations*, 50 Fed. Reg. 7452 (Feb. 22,

    1985) .............................................................................................11

**Other Authorities**

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000).....................................31, 32

FDA, *Guidance for Industry, Changes to an Approved NDA or ANDA*,

    Revision 1 (Apr. 2004), https://www.fda.gov/media/71846/download .......50, 51

Letter of Janet Woodcock, U.S. Food & Drug Admin., Docket No.

    FDA-2020-P-0042 (Apr. 1, 2020) ................................................................35, 36

4 Matthew Bacon, *A New Abridgment of the Law* 631 (4th ed. 1778)....................32

Restatement (Second) of Torts §402A (Am. Law. Inst. 1965)................................37

U.S. Const. art. VI, cl. 2...................................................................28, 45

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. §1291 because the district court entered final judgment.  Federal subject matter jurisdiction in the district court was not proper under 28 U.S.C. §1332 because the district court destroyed complete diversity by merging the cases.

## INTRODUCTION

For years, Appellants took ranitidine to treat their heartburn.  They did not know that ranitidine degrades over time into a dangerous chemical known as N-Nitrosodimethylamine (NDMA).  NDMA was first discovered as a byproduct of rocket fuel combustion.  Its only commercial use is to induce tumors in animal experiments.  Long recognized by the scientific community as a potent carcinogen, NDMA has no medicinal purpose whatsoever.  In late 2019, after ranitidine had been on the market for nearly four decades, the Food and Drug Administration (FDA) finally learned the truth about this dangerous drug.  Alerted to ranitidine's cancer hazard by a group of independent scientists who detected NDMA, FDA required manufacturers to test for it.  When the test results came in, FDA realized the magnitude of the problem, and ordered that all ranitidine be withdrawn from the market.  Unfortunately, those actions came too late for Appellants, who consumed the NDMA in ranitidine and developed cancer.

Appellants filed suit against manufactures of generic ranitidine (the "Generic Defendants").  The district court erred at the outset by merging all the cases together through a master complaint, creating a monolithic MDL action with incomplete diversity between the parties.  Though Appellants initially resisted this jurisdiction-destroying interpretation of the district court's actions, subsequent events render it

the only plausible interpretation of what transpired. This Court must vacate the dismissal.

If the Court reaches the merits, Appellants' suit is plainly permitted by the laws of their respective home states, which impose a duty on companies not to sell unreasonably dangerous products. And, contrary to what the district court concluded, it is not preempted by federal law. The reason is simple. Preemption applies when federal and state law *conflict*. When state and federal laws conflict, the Supremacy Clause requires state law to yield. But the Constitution does not void the laws of the States where no conflict exists. Here, far from conflicting, state and federal law are the same. The Food, Drug, and Cosmetics Act required Generic Defendants to stop selling their dangerous drug. *See* 21 U.S.C. §352(j). Indeed, FDA compelled Defendants—under federal law—to cease all ranitidine sales. State design-defect law required the same thing.

The district court erroneously concluded that it was *impossible* for Defendants to comply with identical state and federal obligations. That conclusion finds no support in the leading generic-drug preemption cases such as *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013). In *Bartlett*, the plaintiff argued that state design-defect law required the defendant to strengthen the warnings for its drug, but federal law forbade those label changes, making it impossible to comply with the laws of both sovereigns. The Court rejected the argument that the defendant

2

could achieve joint compliance by stopping sales of its drug. In doing so, the Court made crystal clear that its holding did not extend to "the rare case in which state or federal law actually require[d] a product to be pulled from the market." 570 U.S. at 487 n.3. This is that case.

The errors did not stop there. The district court allowed an amended pleading, and Appellants outlined five distinct ways the Generic Defendants could have unilaterally reduced the danger of their ranitidine by, for example, shortening the expiration dates or packaging the product to would reduce degradation into NDMA. The district court held that these claims too were preempted. On the district court's view, because ranitidine could not be made completely safe—which it could not, as FDA's recall proved—nothing the Generic Defendants could have done would have been enough. Even if they could make the drug *safer*, they could not *entirely* satisfy every possible aspect of each state's tort-law duties. And, because they could not satisfy every possible duty, preemption protected them from all state-law claims, even with respect to the actions they could have taken. This nonsensical ruling would mean that every defendant can prevail on preemption grounds with respect to *all* claims so long as there is *some* aspect of state law—even if not pleaded in any count—that cannot be satisfied. That defies logic, precedent, and preemption doctrine. This Court should vacate.

## STATEMENT OF THE ISSUES

1.    Did the district court lack subject matter jurisdiction based on diversity because the operative pleading included parties from the same states?

2.    Where a plaintiff pleads a design defect in a drug based on post-approval scientific evidence FDA never considered, is that state-law claim preempted even though both state and federal law require drug sellers to remove the unsafe product from the market?

3.    Where state law would require a drug company to act with care in multiple distinct ways (transporting and storing a drug at lower temperatures and humidity, listing a shorter expiration date, and changing the design overall), and federal law prohibits the drug company from complying with state-law in one way (changing the design overall), but allows compliance otherwise, does conflict preemption bar all state-law claims, or only to the extent state law requires actions that federal law prohibits?

## STATEMENT OF THE CASE

Each Appellant in this appeal consumed ranitidine, the generic version of the drug widely known as Zantac. No manufacturer of ranitidine took any steps to mitigate the risks that independent scientists and FDA have finally uncovered: that ranitidine contains staggering amounts of NDMA, a potent and well-known human carcinogen. Appellants were diagnosed with cancer. They sued the Generic Defendants, alleging that the NDMA in ranitidine caused it.

4

## A.  Factual Background

Ranitidine belongs to a class of drugs, known as H2 blockers, that help to decrease the acidity of the stomach.  Master Personal Injury Complaint (MPIC) ¶226 (MDL.Dkt.887[1]).  It was developed in the late 1970s by a predecessor to the pharmaceutical giant GlaxoSmithKline (GSK).  For decades, ranitidine generated billions of dollars in both its branded and generic forms.  As recently as 2018, it remained one of the top ten antacid tablets sold in the United States.  *Id.* ¶252.  Just a year later, FDA learned about ranitidine's true safety profile and forced drug companies to pull all ranitidine products from the nation's shelves.

### 1.  Ranitidine degrades into carcinogenic NDMA.

In late 2019 and early 2020, FDA received two separate Citizen Petitions from groups of concerned, independent scientists.  MDL.Dkt.887 ¶¶285, 299.  The first petition alerted the agency that ranitidine may contain high levels of NDMA.  *Id.* ¶285.  The second indicated that the NDMA was coming *from the ranitidine itself*— providing evidence, that over time and especially when exposed to heat, ranitidine degrades into dangerous amounts of the NDMA molecule.  *Id.* ¶¶299-300.

These Citizen Petitions got FDA's immediate attention, for good reason.  EPA and the International Agency for Research on Cancer classify NDMA as a probable

---

[1] This brief refers to docket entries in this Court as "Dkt.," on the MDL docket as MDL.Dkt., and on individual case dockets as *LastName*.Dkt.

human carcinogen. *Id.* ¶254. The World Health Organization cites "conclusive evidence" that NDMA can cause cancer. *Id.* ¶259. Both the Department of Health and Human Services and FDA have likewise concluded that exposure to NDMA can cause cancer in humans. *Id.* ¶¶257-58. Today, NDMA has only one recognized use: to induce cancerous tumors in animals for laboratory experiments. *Id.* ¶3.

Prompted by the Citizen Petitions, FDA quickly took action to investigate. Its initial testing identified ranitidine products containing "unacceptable levels" of NDMA. *Id.* ¶296. Based on those results, in late 2019 FDA requested that companies recall any ranitidine confirmed to contain NDMA above acceptable levels. *Id.* As FDA explained at the time, the agency issues a recall request where it has determined that a product is in violation of the laws it administers. *Id.* ¶301, n.47 (citing letter of Janet Woodcock). Generally, FDA asks companies to perform recalls voluntarily; if they resist FDA may initiate seizure proceedings. 21 U.S.C. §334.

In 2020, FDA performed additional testing, revealing that the NDMA in ranitidine increases over time. *Id.* ¶302. These results "eroded [FDA's] confidence" that ranitidine could ever remain stable and safe through its labeled expiration date. *Id.* After that finding, FDA expanded its recall, from just the ranitidine that tested over the NDMA limit before it was distributed commercially, to *all* ranitidine (even

ranitidine that tested below the NDMA limit initially)—a nationwide market withdrawal.  *Id.* ¶301.

FDA was not alone.  By 2020, regulators in forty-three other countries similarly withdrew the drug from the market.  *Id.* ¶303.  Sadly, these actions did nothing to help Appellants.  For them and so many others who took ranitidine, the drug had already taken its devastating and often deadly toll.

### 2.   Defendants knew or should have known about ranitidine's dangers decades sooner.

The tragedy of the ranitidine story is that it did not have to happen.  From early on, there were red flags pointing to ranitidine's cancer hazard.  But instead of warning the public, or raising concerns with FDA, or even further investigating the issue themselves, the drug companies did nothing.

In 1983, for example, a group of Italian scientists published a study showing that NDMA is produced when ranitidine mixes with nitrites in the stomach's gastric fluids.  MDL.Dkt.887 ¶310.  Nitrites are chemicals contained in certain foods like processed meats.  *Id.* ¶¶309, 327.  The scientists' study made a simple suggestion: people using ranitidine, especially those using it for extended periods, should be advised to eat a diet low in nitrites or avoid taking the medication close in time to meals.  *Id.* ¶310.  Other studies reached similar conclusions regarding ranitidine's cancer danger—studies that were never revealed to the public or FDA. *E.g.*, MDL.Dkt.2759 ¶393.

Instead of disclosing this mounting science to consumers, drug companies doubled down on their strategy to maximize profits from ranitidine. They spent millions on advertising campaigns showing people taking ranitidine to control heartburn caused by foods notoriously *high* in nitrites, like tacos and pizza. MDL.Dkt.887 ¶¶311, 328. They downplayed the potential hazard flagged by the Italian scientists, telling FDA the risk was "unrealistic," since most people would take ranitidine for only a short time. *Id.* ¶¶314-15. But Appellants, and millions of other Americans, used ranitidine daily for years or even decades.

## B. Legal Background for Generic Drugs.

### 1. Selling pharmaceuticals is only lawful with FDA approval.

Under the Federal Food, Drug, and Cosmetic Act 21 U.S.C. §301 *et seq.* (FDCA), it is unlawful to sell a new drug without pre-approval by FDA. 21 U.S.C. §355(a). The manufacturer who develops a new drug—referred to as the brand-name drug—must submit a New Drug Application (NDA) to FDA. FDA only approves a drug once it determines based on scientific evidence and data submitted by the NDA applicant that the drug is safe and effective. *Id.* §355(d); *see also Bartlett*, 570 U.S. at 476 ("for the FDA to consider a drug safe, the drug's 'probable therapeutic benefits must outweigh its risk of harm'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 140 (2000)). After an NDA is approved, the applicant remains obligated to send new and emerging scientific information to

FDA and, where the information warrants it, to update the drug's label without first seeking FDA's approval. *See* 21 C.F.R. §314.70.

After FDA-approval, the brand-name manufacturer enjoys a period of exclusivity; but following that period other drug manufacturers can file Abbreviated New Drug Applications (ANDAs) to sell a virtually identical drug called a generic. *See* 21 U.S.C. §355(j). Generic drugs may differ in some respects from the branded drug (for example, the expiration date, testing, and packaging), but the warnings and precautions, active ingredient, and dosage must be the same. *Id.*

### 2. Congress made pharmaceutical manufacturers and sellers responsible for patient safety.

Receiving FDA approval for a branded or generic drug is necessary to lawfully sell it. But it does not provide blanket license to continue selling the drug no matter what circumstances develop. All participants in the distribution system—from manufacturers to retailers—have a continuing duty under federal law not to sell "misbranded" drugs. This is a defined statutory term that encompasses far more than advertising. A drug is "misbranded" if it "is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof"; if "its packaging or labeling is in violation of an applicable [FDA] regulation"; or if its "labeling is false or misleading in any particular." 21 U.S.C. §352(j), (p), (a)(1).

9

The manufacture, sale, receipt, or delivery of a misbranded drug into interstate commerce triggers civil or criminal penalties. *See* 21 U.S.C. §§331, 333-334. The FDCA's misbranding provision gives important powers to FDA, since it can both enforce the statute and create regulations that trigger liability. But the definition of a misbranded drug is unambiguously broader than merely complying with FDA regulations. That is obvious from the text of the statute itself, which refers to FDA regulations in only one of the definitions of misbranding. *See* 21 U.S.C. §352(p). Other definitions forbid the manufacture or sale of a drug that is dangerous to health when used as labeled or that has a false or misleading label. 21 U.S.C. §§352(j), (a)(1). Indeed, "it has remained a central premise of federal drug regulation that the manufacturer," not FDA, "bears responsibility for the content of its label at all times" and "is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." *Wyeth v. Levine*, 555 U.S. 555, 570-71 (2009).

FDA's regulations are just as clear that NDA or ANDA approval in the past offers no dispensation in the present from the misbranding provisions of the FDCA. The agency implemented a separate regulatory section to make just this point, titled "Adulteration and misbranding of an *approved* drug." 21 C.F.R. §314.170 (emphasis added). This section states: "All drugs, including those the Food and Drug Administration approves under [the NDA and ANDA provisions], are subject

to the adulteration and misbranding provisions" of the FDCA. *Id.* At the time this provision was promulgated, "several comments urged that this section be deleted, believing that the only lawful procedure for dealing with adulterated or misbranded approved new drugs is by withdrawal of approval of the application." *New Drug and Antibiotic Regulations*, 50 Fed. Reg. 7452, 7488 (Feb. 22, 1985). FDA disagreed:

> [T]he new drug provisions do not insulate approved drugs and antibiotics from the general adulteration and misbranding provisions of the act. As FDA has previously noted, the statutory scheme contemplates FDA's application of the adulteration and misbranding standards to all drugs, irrespective of whether those drugs have been subject to the premarket approval requirements of the act.

*Id.*

Congress was so intent on protecting consumers from misbranded drugs that it created liability with no *mens rea*—a strict liability crime. *See United States v. Dotterweich*, 320 U.S. 277, 281 (1943) (The FDCA "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing."). Under federal law, if a drug is misbranded and sold in interstate commerce, the seller or manufacturer violates the law—irrespective of their knowledge or level of care.

FDA pre-approval and liability for misbranding post-approval are complements in Congress's regulatory scheme. FDA approval speaks authoritatively on the safety and effectiveness of a drug *at the time of approval* based on the information provided. But FDA approval "do[es] not give drug

11

manufacturers an unconditional right to market their federally approved drug *at all times* with the precise label initially approved by the FDA." *Wyeth*, 555 U.S. at 592 (Thomas, J., concurring) (emphasis added). Science develops. New risks come to light. And so, "[t]he misbranding statute requires a manufacturer to pull even an FDA-approved drug from the market when it is 'dangerous to health' even if 'used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.'" *Bartlett*, 570 U.S. at 487 n.4 (quoting 21 U.S.C. §352(j)).

## C.   The District Court Dismissed All Claims Against Generic Defendants.

Thousands filed suit seeking relief for the harm that ranitidine caused them. In 2020, those suits were centralized in the Southern District of Florida. *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368 (J.P.M.L. 2020). The district court issued myriad pre-trial orders, one of which required that the MPIC "together with the Short Form Complaint shall be deemed the operative Complaint" for each action. MDL.Dkt.876 at 3. The MPIC covered the waterfront, alleging fifteen counts against five groups of defendants, including defendants from the home states of Appellants in this case.

### 1.   The district court dismissed claims in the MPIC.

Generic Defendants moved to dismiss every case in the entire MDL based on preemption. Generic Defendants argued that all claims were preempted because no

12

Defendant could change the design or label of ranitidine without pre-approval from FDA. Plaintiffs responded that state law requires defendants to stop selling products when the product is unjustifiably dangerous due to its defective design. Plaintiffs explained that that duty is harmonious with federal law when a drug is misbranded, which is to say, when it "is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. §352(j). Because federal law forbids the manufacture, sale, or receipt of misbranded drugs, 21 U.S.C. §331(a)-(d), and state design defect law requires the same thing, the two regimes do not conflict.

The district court granted the motion. *See* MDL.Dkt.2512 ("Generic Order"). Crucially, the court "assume[d]," for the purposes of its order, "that Plaintiffs have adequately alleged that ranitidine products were misbranded" under the FDCA. *Id.* at 30. Nonetheless, the court held that *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), and *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472 (2013), required a finding of preemption:

> *Mensing* and *Bartlett* further instruct that the ability to comply with both federal and state law by withdrawing misbranded ranitidine products from the market does not defeat pre-emption. A claim based on an allegation that a generic drug's labeling renders the drug misbranded is a pre-empted claim because the drug's manufacturer cannot independently and lawfully change FDA-approved labeling.

13

MDL.Dkt.2512 at 27.  The district court opined it was "of no matter" that "federal law imposes criminal liability on a drug manufacturer that introduces a misbranded drug into interstate commerce" because only the United States, not a private plaintiff, can enforce it.  *Id.* at 28.  Similarly, the court deemed Supreme Court cases about parallel claims irrelevant because "*Reigel*, *Bates*, and *Lohr* did not address impossibility preemption."  *Id.* at 36 (referring to *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005); *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), and *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)).

The court further concluded that preemption applies to factual allegations, not to claims.  *Id.* at 28-29 ("[A]llegations that [generic] ranitidine products were defectively designed because they break down into NDMA and claims based on failure to warn consumers that the products contained NDMA or could break down into NDMA when ingested" are "pre-empted.").  Accordingly, the court required "Plaintiffs' counsel" to "identify these allegations and to omit them from claims against Generic Manufacturer Defendants upon repleading the Master Complaints." *Id.* at 29.

## 2.  The district court dismissed claims in the AMPIC.

Plaintiffs filed an Amended Master Personal Injury Complaint ("AMPIC"). *See* MDL.Dkt.2759.  The amended claims against the Generic Defendants focused on actions they could take *unilaterally*.  Specifically, the AMPIC alleged that the

Generics were liable for failure to: (1) shorten the expiration dates on ranitidine, *Id.* ¶¶932-1146 (Count III); 1147-1370 (Count IV); 1734-1948 (Count VII),[2] (2) package ranitidine to minimize exposure to humidity, *id.* ¶¶1984-2206 (Count IX); (3) store and transport ranitidine at low temperature and humidity, *id.* ¶¶2433-2667 (Count XI);[3] (4) warn consumers by warning FDA as a third-party intermediary, *id.* ¶¶1371 (Count V); test adequately (Count VIII).[4]

The AMPIC alleged that each count was independently cognizable. To see why, consider Count III, which was a claim for "strict products liability—failure to warn through proper expiration dates." *Id.* ¶932. The AMPIC pleads that ranitidine "degrades to form NDMA, and the NDMA levels in the drug ... increase over time under normal storage conditions, but more so with exposure to heat or humidity." *Id.* ¶935. A longer expiration date gives the drug time to degrade into more and more NDMA; a shorter expiration date would warn consumers not to leave ranitidine on their shelves too long, meaning ranitidine would have "far lower levels of NDMA when consumed." *Id.* ¶¶937-38. And, as one would expect, "[h]igher exposures to

---

[2] Factually, Counts III, IV, and VII are similar, but they cover different legal theories (strict product liability failure-to-warn, negligent failure to warn, and strict product liability design defect).

[3] Count X is similar, but addressed only finished ranitidine pills and alleged a claim against retailers rather than manufacturers. MDL.Dkt.2759 ¶¶2207-2432 (Count X).

[4] The district court also required plaintiffs to plead each count separately under each state's law (and for each legal theory), which is why the AMPIC is quite long.

NDMA" produce "higher risks of cancer." *Id.* ¶936. Generic Defendants had the knowledge and duty to set their expiration dates based on stability testing and breached that duty in setting them at 2-3 years. *Id.* ¶¶939-62. The sub-counts for each State specifically allege that, had Generic Defendants included a proper expiration date on ranitidine, "Plaintiffs would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA." *Id.* ¶966.

The theory behind the packaging, storage, and transportation counts (Counts IX-XI) is similar. Generic Defendants' packaging, storage, and transportation choices each caused ranitidine to degrade into more NDMA through delay between manufacture and consumption (time) or exposure to additional heat or humidity. The AMPIC alleges that the additional NDMA produced by this conduct *itself* harmed Plaintiffs. Each of these claims were alleged in the alternative.

The Generic Defendants again moved to dismiss. The district court held that the facts pleaded in the complaint about expiration dates, storage and transportation, and packaging plausibly stated a claim. *See* MDL.Dkt.3717.[5] In particular, the district court found that "Plaintiffs have plausibly pled that the Manufacturer Defendants should have known, through stability testing of their ranitidine products, that ranitidine can degrade to form NDMA over time and due to exposure to

---

[5] The Court declined to rule on the plausibility of Count V in light of its dismissal on preemption grounds. MDL.Dkt.3717 at 18-19.

moisture." *Id.* at 15. And "testing would have revealed degradation and NDMA accumulation in ranitidine products." *Id.* The AMPIC even "identified one test that ... could have detected NDMA and that was available." *Id.* at 16. The district court rejected any challenge to the pleadings on causation, though it reserved a state-law-specific question about which test applies for design-defect claims. *Id.* at 17. The failure-to-test and negligent storage and transportation claims likewise "survive[d]" any "plausibility challenge." *Id.* at 20, 26.

Though plausibly pleaded, the district court dismissed all claims against the Generic Defendants based on preemption. *See* MDL.Dkt.3750. Its reasoning made the perfect the sworn enemy of the good: because federal law made *certain* actions impossible (a cancer warning, or a redesign of the drug), impossibility preemption also nullified state law that Defendants *could* comply with. "[F]ederal law prevented the Generic Manufacturer Defendants from giving *all* necessary warnings about the risks of ingesting ranitidine and from taking *all* reasonable steps to protect consumers from the dangers of ranitidine." *Id.* at 43. The Generic Defendants "could only make the warnings better (albeit ultimately inadequate) and make ranitidine less dangerous (albeit not safe)." *Id.* at 44. Thus, reasoned the court, the Generic Defendants could not *fully* comply with state law—only aspects of it. And so all of state law was preempted—including those parts Generic Defendants could comply with.

17

**STANDARD OF REVIEW**

A court of appeals "review[s] *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012). And it "also review[s] *de novo* ... whether federal law preempts a state law claim." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181 (11th Cir. 2017) (en banc).

**SUMMARY OF ARGUMENT**

The district court lacked diversity jurisdiction because it merged the personal injury cases. Its own orders confirm that the cases are merged. Consequently, citizens from the same state are on both sides, destroying diversity and demanding vacatur.

On the merits, the MPIC's claims are not preempted. The state and federal claims here do not conflict because federal law made selling ranitidine illegal. The district court rejected this argument by ignoring the differences between this case—involving a recalled drug—and the typical case, and by making impossibility preemption easier to show than express preemption.

The AMPIC's claims survive preemption even more clearly. Those claims are limited to actions the Generic Defendants could have taken unilaterally. No court has ever found preemption when the defendant could comply with the state law duty alleged in the complaint. The district court's logic transformed preemption from a

18

narrow doctrine that applies to the extent of conflict into a broad doctrine that bars entire realms of state law if any part of them is incompatible with federal law. That contravened this Court's precedent and should be reversed.

## ARGUMENT

Before considering the merits of the district court's order, this Court must first decide whether the district court had subject-matter jurisdiction. It did not—the district court merged the cases, destroying complete diversity. If the Court reaches the merits, it should reverse because the claims here are not preempted for multiple independent reasons.

## I. The District Court Lacked Subject-Matter Jurisdiction Because The Parties Are Not Completely Diverse.

This Court "carried with the case" the jurisdictional question "of whether the individual cases in this proceeding merged into a single action for pretrial purposes, and if so, whether that merger destroyed the district court's diversity jurisdiction." Dkt.375 at 2. That sets up two questions: are the cases merged, and, if so, does merger destroy diversity? They were. And it does.

### A. The Actions Were Merged.

Previously, Appellants argued that the cases were not merged, since the short-form complaints, incorporating the master complaint, were operative. *See* Dkt.265. On that view, the master pleadings were administrative documents—when the district court held that allegations in the MPIC were plausible, or preempted,

Appellants' interpreted that to mean that the allegations *incorporated by reference* in individual short-form complaints were plausible, or preempted. That explanation treated all cases as distinct. Different Zantac Appellants made the same arguments in other appeals, as that response noted, and Appellants expected them to prevail. *See id.* at 1. After this Court rejected that same argument, and the district court proceeded in a manner irreconcilable with it, Appellants reluctantly concede that the cases were merged.

The chief reason Appellants' changed their view is this Court's holding that the Zantac MDL motion-to-dismiss decisions applied only to the master complaint, *not* any short-form complaint. *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 21-10305, 2022 WL 16729151, at *5 (11th Cir. Nov. 7, 2022). That holding necessarily means that the master pleading is an operative pleading, not merely a reference document. The district court could not issue opinions affecting *only* a reference document without affecting any actual, live claims between litigation adversaries. *E.g.*, *Hayburn's Case*, 2 U.S. (Dall.) 408, 409 (1792). But this Court held that the district court's rulings *did* affect only the MPIC, not any short-form complaint. It necessarily follows that the MPIC was the operative pleading, not a reference document. And if the MPIC was the operative pleading, it necessarily included as parties all of the personal-injury plaintiffs, such as Appellants, who relied on its factual allegations.

20

That is what Defendants have said all along.  *E.g.* Dkt.246 at 31 ("Appellants' Individual Actions Were Merged Into the MPIC, Which Has Not Been Dismissed"); Dkt.233 at 44 ("the MPIC is the relevant operative pleading").  And that is what the district court said all along.  *E.g.*, MDL.Dkt.4595 at 21 ("the Plaintiffs' assertion that the master complaints were 'not intended to consolidate for any purpose the separate claims of the individual Plaintiffs in this MDL' is simply not true—that was the precise purpose of the master complaints and at all times the Court and the parties conducted themselves in accordance therewith").  Though the district court concluded that "the objective actions of the parties and the Court favor the application of the merger doctrine," *id.* at 22, it nonetheless deemed them *not* merged under a strained application of waiver principles that no party argued for below, and no party has defended here.[6]

The second reason Appellants' changed their view is that the district court—after nominally ruling that cases were *distinct* in May, 2021, *id.*, actually treated the

---

[6] The Distributors and Retailers have argued that the cases are merged as well, *e.g.*, Dkt.266 at 13, though they make the strange argument that a court can "temporarily merge cases under *Gelboim* footnote 3 while preserving the cases' separate identities."  This is incoherent.  If a court "temporarily" merges non-diverse parties, it "temporarily" lacks subject-matter jurisdiction to adjudicate claims on the merits.  The actual rule Distributors and Retailers request is that the cases are simultaneously both merged and not merged, with merger occurring for the merits rulings but not for purposes of diversity jurisdiction.  No court, ever, has or could embrace that tortured reimagination of the complete-diversity rule.

cases as merged both before that ruling (as it conceded it had done) and, critically, after it. Take, for example, Mr. Cartee's case. He alleged only an innovator liability claim against Brand Defendants under Illinois law, which the district court decisively rejected. MDL.Dkt.1585; MDL.Dkt.2516. He tried to appeal, but this Court ruled that it lacked appellate jurisdiction. *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2022 WL 16729151. So, he asked for judgment to be entered in his case, but the district court refused. MDL.Dkt.6317. It ruled, among other things, that he could not allege an innovator liability claim from the MPIC, because that pleading had been "supersede[d] and replace[d]" by the Second Amended MPIC— the only operative pleading. *Id.* at 2 (quotations marks omitted). This makes sense only if the cases merged—the Second Amended MPIC replaces the previous pleading *for the action as a whole*, and, of course, any party to the action must use the current, operative pleading. If the cases are distinct and individual, this ruling would be nonsensical—Mr. Cartee can incorporate anything he likes by reference into *his* pleading. There is no basis to say that anything incorporated by reference has been "superseded" or "replaced"—the very act of alleging it makes the incorporated language operative for that case.

General causation litigation made even clearer that the actions were merged. Plaintiffs' Leadership disclosed certain experts for general causation to be used in personal injury bellwether trials. The Brand Defendants moved to exclude these

experts under *Daubert* and for summary judgment on the element of general causation, which the court granted.  MDL.Dkt.6120.  Normally, the exclusion of an expert in one case would not mean that different plaintiffs in different cases cannot disclose a different expert opining on the same issues—but exclusion of an expert in one case *would* mean that the expert cannot testify in *that case*.  The district court treated the entire MDL as one case.  Its show-cause order specifically noted that because the *Daubert* order is "law of the case," any plaintiff claiming not to be bound by the *Daubert* order would have to "address how the law of the case could be different for any individual late-filing Plaintiff."  MDL.Dkt.6444 at 16.

Consistent with that view, it applied the *Daubert* order not only to the bellwether plaintiffs (who proffered the specific experts the court excluded to testify at their trials), but also to *every* plaintiff in the MDL, with no opportunity to opt-out, or select another expert.  Worse, the court applied the *Daubert* order to plaintiffs who filed cases *after* the experts were disclosed (and thus could not possibly have agreed to use those experts).  The court even applied the *Daubert* order to plaintiffs who filed cases *after the Daubert order was issued*.  In the Court's words, its "own understanding, based upon what it learned at the *Daubert* stage of these proceedings, [is] that the theoretical potential of ranitidine to cause cancer would be the same for every Plaintiff, regardless of the date upon which a Plaintiff filed his or her case."  MDL.Dkt.6622 at 5.  And, because it was all one merged case, no plaintiff could

proffer different expert witnesses. Thus, "the Court's prior summary judgment ruling applies to every Designated Cancer case in this MDL." *Id.* at 6.[7]

Consider how it treated the claims against non-Brand Defendants. These Defendants did not participate in expert discovery, never moved to exclude experts, did not attend the *Daubert* hearing, and did not sign any of the briefs. Nonetheless, the district court granted summary judgment on claims against them *sua sponte* under Rule 56(f). MDL.Dkt.6622. Incredibly, the district court *vacated* a years-old Rule 54(b) judgment in favor of the Generic Defendants—even though Generic Defendants never asked it to—declaring, "The prior order of dismissal is amended to include an additional ground for the dismissal: the Court's entry of Rule 56(f)

---

[7] The court imposed a "show cause" process for cases filed after the *Daubert* order, but did not allow those plaintiffs to proffer new experts, even though many Plaintiffs never "consented to using the slate of experts" excluded by the court, and "strongly" wished to retain their own. MDL.Dkt.6540 at 2. The court rejected this out of hand. *See* MDL.Dkt.6622 at 6. Rather, the court saddled every plaintiff with the expert witnesses and evidentiary record previously litigated, then demanded that new plaintiffs "show cause" why it should reconsider its decision to exclude the experts it had already excluded. That process only makes sense if the cases are merged. And, to be clear, the order below is extraordinary—MDL courts generally allow Plaintiffs to adopt leadership's experts *or* proffer their own, for obvious due process reasons. *E.g.*, *In re Denture Cream Prod. Liab. Litig.*, 204 F. Supp. 3d 1348, 1350 (S.D. Fla. 2016) (referencing an order requiring plaintiffs to choose whether to retain their own experts); *In re Acetaminophen-ASD-ADHD Prod. Liab. Litig.*, No. 22-MC-3043, ECF No. 1408 (S.D.N.Y. Feb. 16, 2024) (in the same procedural posture as the Zantac MDL, but allowing individual plaintiffs to proffer their own expert).

24

summary judgment on general causation grounds because the Court's 56(f) ruling applied to every Designated Cancer claim."  MDL.Dkt.6974 at 5.

At every step the district court treated the cases in the Zantac MDL as merged. This Court did too.  So did Defendants.  Appellants now also agree.

## B.   If the Actions Merged, There Is No Jurisdiction.

Appellants have always maintained that if the cases in the Zantac MDL are merged, the district court lacked diversity jurisdiction.  *See* Dkt.265 at 8-9.  The reason is simple to explain.  The Generic-Only Appellants are from Washington, Montana, Illinois, Florida, Tennessee, Pennsylvania, Kentucky, North Carolina, Texas, and North Dakota.[8]   The Defendants named in the MPIC are citizens of Washington, MDL.Dkt.887 ¶¶160, 162 (Amazon.com and Costco),[9] Illinois, *id.* ¶¶198-202 (Walgreen and Duane Reade), Florida, *id.* ¶¶55-58, 189-90, 207-209 (Apotex, Publix, and Winn Dixie), Tennessee, *id.* ¶¶150-51 (Chattem), Pennsylvania, *id.* ¶¶45-47, 93-94, 174, 191-92 (Amerisource Health Services, Lannett, Giant Eagle, and Rite Aid), Kentucky, *id.* ¶177 (Humana), North Carolina, *id.* ¶¶169-72 (Family Dollar), and Texas, *id.* ¶¶120, 152-53, 175-76 (Ranbaxy,

[8] The short-form complaints list this information.  *See* Bodey.Dkt.1; Burnett.Dkt.1; Colbert.Dkt.1;    Comerford.Dkt.1;    Darocha.Dkt.1;    Doby.Dkt.5;    Ford.Dkt.15; Hoback.Dkt.1;  Johnson.Dkt.1;  McLeod.Dkt.1;  Mullins.Dkt.7;  O'Driscoll.Dkt.8; Osorio.Dkt.1;     Reyna.Dkt.5;     Smart.Dkt.7;     Taylor.Dkt.1;     Wessman.Dkt.1; Wishop.Dkt.5.

[9] The AMPIC also lists these parties.  *E.g.*, MDL.Dkt.2759 ¶173 (Amazon).

McKesson, and HEB).  If the actions are merged, there are both Plaintiffs and Defendants from Washington, Illinois, Florida, Tennessee, Pennsylvania, Kentucky, North Carolina, and Texas—and so no complete diversity. What's more, merger meant that the Appellants here were plaintiffs alongside every other personal-injury Plaintiff, and Appellees here were parties alongside every other Defendant.  The Plaintiffs, collectively, are citizens of virtually every state and territory of the United States, and the Defendants span more than a dozen states.  Nobody argues that there was complete diversity if all personal-injury plaintiffs sued all defendants in a single, merged action.

Without complete diversity, the district court lacked jurisdiction.  The merits rulings should be vacated, and all cases dismissed without prejudice.

## C.  The Arguments Supporting Jurisdiction Are Unavailing.

Various Appellees have argued in different ways to avoid the conclusion that the district court lacked jurisdiction, but each argument is unpersuasive.

Some have argued that merger is "only for 'pretrial proceedings," rather than "forever for all purposes," and therefore jurisdiction remains on the promise of eventual "remand[]."  Dkt.246 at 35.  Appellants already explained why this argument fails, Dkt.265 at 9 ("if the cases are merged[, ]diversity did not exist at filing, does not exist now, and will *never* exist"), but the basic problem is that lack of diversity only for pretrial proceedings produces lack of jurisdiction for pretrial

proceedings. Whether, for some theoretical case—not these cases, of course, in which final judgment has been entered—remand could restore diversity is irrelevant, since the challenge is not to the post-remand court's jurisdiction, but to the pre-remand court's jurisdiction.

Generic Defendants have argued that diversity jurisdiction is retained because the cases involved completely diverse parties when they were filed. Dkt.264 at 11. This argument ignores binding precedent . As this Court explained, there is no case that holds "that all additions of nondiverse parties are permissible as long as complete diversity existed at the time of commencement of the lawsuit." *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 861 (11th Cir. 1998). Rather, when parties are joined to an action—as happened here with the universal adoption of the master pleading—"complete diversity no longer existed between the parties, thereby destroying subject matter jurisdiction." *Id.* at 861-62. Just as in *Ingram*, "[t]he district court had no discretion to add the [non-diverse parties], retain jurisdiction and decide the case on the merits." *Id.* at 862. But that is exactly what the district court did. There is not complete diversity, and so the cases must be vacated with direction to dismiss for lack of subject matter jurisdiction.

## II. The District Court Erred In Holding That Impossibility Preemption Bars State-Law Claims In The MPIC That Parallel Federal Law.

Assuming this Court reaches the merits, it should vacate the district court's first preemption order because the FDCA does not preempt state law that requires a

defendant to take the same actions.  Impossibility preemption applies only where a defendant cannot comply with state law duty because federal law imposes the opposite duty.  Where state and federal duties are the same, compliance with state law is not only possible, it is *compelled* by federal law.  Here, the FDCA and state law required the Generic Defendants to withdraw their drugs from the market because they were unsafe.  That fact places this case outside the Supreme Court's generic-drug precedents, which carefully carved out "state design-defect claims that parallel the federal misbranding statute" and makes this "the rare case in which state or federal law actually requires a product to be pulled from the market." *Bartlett*, 570 U.S. at 487 n.3 & n.4.

## A.  Fundamental Preemption Principles Preserve Parallel Duties.

### 1.  The basic logic of conflict preemption always preserves parallel state law duties.

Preemption flows from the Supremacy Clause, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.  Any "thing" in state law that "interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (citation omitted).  Occasionally, Congress occupies an entire field of law, deeming *any* state regulation in the same domain incompatible with supreme

federal law. "Where Congress occupies an entire field ... even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, *even if it is parallel to federal* standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012) (emphasis added)). But where Congress decides not to occupy the field, state laws may always regulate the same domain to the extent they impose parallel duties.

This principle frequently arises where Congress manifests an *express* intent to preempt state laws. For example, in *Bates*, the Supreme Court held that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which expressly preempts all state pesticide requirements "in addition to or different from" federal law, did not preempt state requirements that were parallel to the federal requirements. 544 U.S. at 447 (quoting 7 U.S.C. §136v(b)). The Court started with the simplest case: "state regulation requiring the word 'poison' to appear in red letters, for instance, would not be pre-empted if an EPA regulation imposed the same requirement." *Id.* at 444. The Court then held that state common-law duties are also not preempted if they are "equivalent to, and fully consistent with" the federal law. *Id.* at 447. Borrowing its analysis from the Medical Device Amendments to the FDCA, the Court dubbed such requirements "parallel." *Id.* ("[The] 'parallel requirements' reading ... finds strong support in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996).").

29

The Court further explained that "[t]o survive pre-emption, the state-law requirement need not be phrased in the *identical* language as its corresponding [federal] requirement." *Bates*, 544 U.S. at 454. Thus, if federal law required a label to say "Poison" in red letters, and the state-law duty required a reasonable warning, then a plaintiff could prevail by showing that the label lacked a reasonable warning *because* it did not say "Poison" in red letters. The failure to comply with federal law put the defendant out of compliance with state law too, making the duties parallel. Ample case law in this circuit and elsewhere apply these familiar principles to parallel claims. *See, e.g.*, *Mink v. Smith & Nephew Inc.*, 860 F.3d 1319, 1329 (11th Cir. 2017); *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1234 (9th Cir. 2013) (en banc); *Hughes v. Boston Sci. Corp.*, 631 F.3d 762, 769 (5th Cir. 2011); *Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010).

Impossibility preemption—a branch of implied conflict preemption doctrine—is *harder* to establish than express preemption. The mere "possibility of impossibility" is not enough to cast aside state law. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314 (2019) (citation omitted). A defendant must show that it is actually "*impossible* for a private party to comply with both state and federal requirements." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (emphasis added). Thus, any state common-law duties that "parallel" federal requirements for purposes of an *express* preemption clause like that at issue in *Bates a fortiori* also survive

30

impossibility preemption.  Where state law parallels federal law, complying with "both state and federal requirements" is obviously possible.

### 2. The original public meaning of the supremacy clause confirms that parallel state duties cannot conflict with federal law.

Applying federal law to preempt parallel state duties would violate not only law and logic—but also the original public meaning of the Supremacy Clause.  The Supremacy Clause reflects a federalism balance struck by the framers after they discarded the Articles of Confederation.  To better protect the people's cherished liberties, it was necessary to "split the atom of sovereignty"—with a *truly* sovereign federal government created from the fission.  *Gamble v. United States*, 587 U.S. 678, 688 (2021) (internal quotations and citation omitted).  But the framers feared that state courts might treat federal law as American courts routinely treated the laws of foreign sovereigns such as England or France: helpful authority that may be followed or ignored based on principles of comity and sound considerations of domestic policy.  *E.g.*, *Bank of Augusta v. Earle*, 38 U.S. 519, 520 (1839).

To address that concern, the Supremacy Clause makes clear that federal law is "supreme"—the "Law of the Land" that states must treat as if it were enacted by the state itself, "rather than as the law of another sovereign."  Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 249 (2000).  The phrase "supreme" also gave federal law a "rule of priority," requiring states to treat that law as not only enacted by the state's legislature, but also as later-in-time, allowing federal law to expressly

31

repeal state law. *Id.* at 250. But even absent express preemption language, federal law—like any later-in-time law—repeals any state law that is *inconsistent* with that federal law. *Id.* at 253-54. Chief Justice Marshall employed this understanding in *McCulloch v. Maryland*, opining that "[a] law, absolutely repugnant to another, [] entirely repeals that other *as if express terms of repeal were used*." 17 U.S. 316, 425-26 (1819) (emphasis added). Thus, if a prior-in-time law is "absolutely repugnant" to a later-in-time law, courts presumed in 1789 (and still presume today) that the legislature intended to repeal the earlier statute, even without express words of repeal in the later-enacted legislation.[10]

In short, the Supremacy Clause mandates that when state and federal law are alleged to conflict, courts must: (i) act as if both were enacted by the same sovereign;

---

[10] Professor Nelson and Justice Thomas have further argued for treating the "notwithstanding" language of the Supremacy Clause as a *non obstante* provision. Under English law received at the time of the framing, courts applied a strong "general presumption against implied repeals." Nelson, *supra*, at 241-42. That strong presumption authorized courts to avoid a plain-text reading of later-enacted statutes to harmonize them with preexisting law. "In the words of Matthew Bacon's New Abridgment of the Law, '[a]lthough two Acts of Parliament are seemingly repugnant, yet if there be no Clause of *non Obstante* in the latter, they shall if possible have such Construction, that the latter may not be a Repeal of the former by Implication.'" *Id.* at 242 (quoting 4 Matthew Bacon, *A New Abridgment of the Law* 631 (4th ed. 1778). The "notwithstanding" language in the Supremacy Clause provides a *non obstante* clause, preventing courts from deploying strained interpretations of Congress's intent to avoid an implied repeal. Because Appellants' argument relies on a plain reading of the FDCA, it is wholly consistent with Justice Thomas's reading of the Supremacy Clause.

(ii) treat federal law *as if* it were enacted later in time, even if it is was not; and

(iii) determine if federal law impliedly repeals some or all of the state law at issue.

Justice Thomas's opinion in *Mensing* adopted this originalist reading, explaining

that the Supremacy Clause "plainly contemplates conflict pre-emption by describing

federal law as effectively repealing contrary state law." *Mensing*, 564 U.S. at 621

(plurality) (citing Nelson, *supra*); *see also Wyeth*, 555 U.S. at 590 (Thomas, J.,

concurring) (citing Nelson, *supra*).

The original understanding of the Supremacy Clause confirms what modern

doctrine requires. The FDCA, viewed as a later-enacted statute, leaves intact any

state law not repugnant to the FDCA's provisions. It certainly does not impliedly

repeal a state law (whether statutory or common law) that imposes duties parallel to

those contained in the FDCA.

### B. The Federal and State Law Duties Here Are Parallel.

Under the facts Appellants have alleged, and that the district court *assumed*,

MDL.Dkt.2512 at 30, both state and federal law required Defendants to stop selling

ranitidine. That result was required by the state-law duty not to sell unreasonably

dangerous products. And it was required by the FDCA's prohibition on

manufacturing, receiving, selling, or marketing misbranded drugs.

This Court's recent guidance in *Carson v. Monsanto Co.*, 92 F.4th 980 (11th

Cir. 2024) explains how to analyze whether a claim is parallel. There, "Georgia

common law d[id] not exactly track FIFRA's requirements." *Id.* at 992. But the laws were nonetheless parallel because "the practical effect [wa]s the same" in that both laws "require[d] pesticide manufacturers to warn users of potential risks to health and safety." *Id.* Here, too, the practical effect is the same: both federal and state law required companies *not to sell the drug at all*.

### 1. Ranitidine is illegal to sell under federal law.

Start with the facts supporting the federal duty not to sell ranitidine. The district court "assume[d], without finding, that Plaintiffs have adequately alleged that ranitidine products were misbranded." MDL.Dkt.2512 at 30.[11] The pleadings allege that NDMA is a potent carcinogen that "has caused cancer in nearly every laboratory animal tested so far." MDL.Dkt.887 ¶¶253, 254-84. The pleadings allege—and all agree—that no ranitidine product listed NDMA as an ingredient, *id.* ¶421, warned of its cancer risk, *id.* ¶382, or in any other way mitigated its dangers. No manufacturer, prior to the recent citizen petitions, ever told FDA about the dangers of NDMA in ranitidine. *Id.* ¶382. Ranitidine degrades into NDMA in the human stomach, through an enzymatic reaction, and over time under normal storage conditions. *Id.* ¶308. Considering just degradation in the stomach, "[u]nder biologically relevant conditions" just "one dose of 150 mg [of] ranitidine" breaks

---

[11] Later, the Court *held* that the pleadings sufficiently alleged that ranitidine was misbranded under federal law (though with respect to different defendants). *See* MDL.Dkt.3715 at 32, 35-36; MDL.Dkt.4487 at 14-15.

down into NDMA levels "ranging between 245 and 3,100 times above FDA-allowable limit.  One would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg ranitidine ...."  *Id.* ¶330.  When this information became public, FDA and comparable regulators from *43 different countries* restricted or banned ranitidine.  *Id.* ¶303.

Taking the allegations as true, the pleadings make plain as day that ranitidine is "dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. §352(j).  That makes selling it illegal under federal law.  That is what FDA concluded.  When the presence of NDMA became public, FDA pulled ranitidine *because* of its danger to health.  FDA initiated the "withdrawal of all ranitidine drug product batches from the U.S. market."  Letter of Janet Woodcock, U.S. Food & Drug Admin., Docket No. FDA-2020-P-0042 at 10 (Apr. 1, 2020) (cited in MPIC ¶301 & n.47).  As the basis for its action, it cited its legal authority to compel the "removal ... of a marketed product that FDA considers to be in violation of the laws it administers," "particularly when those products present a *danger to health*."  *Id.* at 5 (emphasis added).  It explained that although it initially approved ranitidine, "FDA continues to review the quality of drug products throughout their life cycles, and may take regulatory action to facilitate the voluntary recall of a drug product

when the Agency determines that a product in the market violates provisions of the FD&C Act or presents *a danger to health*." *Id.* at 4 (emphasis added).

FDA, of course, concluded ranitidine was not dangerous to health when it approved the drug *in 1983*. And, if the jury were to simply second-guess that determination based on the *same evidence* presented to FDA, that may present a preemption concern. *See Bartlett*, 570 U.S. at 487 n.4 ("Because the jury was not asked to find whether new evidence concerning sulindac that had not been made available to FDA rendered sulindac so dangerous as to be misbranded under the federal misbranding statute, the misbranding provision is not applicable here."). But here, FDA ordered a recall and told consumers to dispose of any ranitidine they had in their homes. MDL.Dkt.887 ¶566. Surely FDA's recent actions "allows the court to draw the reasonable inference" that it encountered new, scientifically significant information. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Ranitidine is illegal to sell under state law.

Next, consider the state duty. The very strictest common law standard flows from comment k of the Second Restatement, which ranitidine easily meets:

> In determining whether placing a commodity on the market is "unreasonably dangerous per se," the reasonable man standard of the Restatement becomes the fulcrum for a balancing process in which the utility of the product properly used is weighed against whatever dangers of harm inhere in its introduction into commerce. Obviously, use of an unavoidably unsafe product always presents at least a minimal danger of harm, but only if the potential

36

> harmful effects of the product—both qualitative and
> quantitative—out-weigh the legitimate public interest in
> its availability will it be declared unreasonably dangerous
> per se and the person placing it on the market held liable.

*Reyes v. Wyeth Lab'ys*, 498 F.2d 1264, 1274 (5th Cir. 1974).  The risks ranitidine poses are profound, and the risks are *completely* unjustified, since "[t]here are multiple alternatives to ranitidine that do not cause cancer."  MDL.Dkt.887 ¶365.  Some states may impose other standards, but this is the most defendant-friendly—if ranitidine satisfies Comment k, then it would easily trigger liability in its over-the-counter form, to which a stricter liability standard applies.  *See* Restatement (Second) of Torts §402A (Am. Law Inst. 1965).  And it would satisfy hybrid states, such as Florida (where the district court sits), which "use[s] both the consumer expectations test and risk utility test as alternative definitions of design defect."  *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 512 (Fla. 2015).

Zooming out from any particular test, as a practical matter *every* state would allow a company to comply with state law by withdrawing the drug from the market.  There may be some state that would "impose[] less of a duty on [pharmaceutical] manufacturers than" federal law does—perhaps allowing withdrawal from the market *or* a change in the label—but state law that is "narrower than federal requirements" still counts as parallel.  *Carson*, 92 F.4th at 992.  Were there any doubt on this score, the Supreme Court proposed a practical option in *Bates*, suggesting that "[i]f a defendant so requests, a court should instruct the jury on the relevant []

misbranding standards, as well as any regulations that add content to those standards" to ensure the federal and state standards are genuinely equivalent. 544 U.S. at 454. The district court here could do the same for the FDCA misbranding standard to guarantee the jury finds liability only when *both* the federal and state standards are met.

### C. FDCA Precedent Is Fully Consistent With The Parallel Claims Theory.

The arguments above demonstrate that parallel duties are not preempted, and that the duties here are parallel. The ineluctable conclusion is that the state-law duties here are *not* preempted. To evade that conclusion, the Generic Defendants argue, and the district court accepted, that the binding precedent on preemption for generic drugs departs from bedrock preemption doctrine. On their argument, parallel claims are an abstract theory that the Supreme Court has rejected. This is a misreading of precedent.

The Supreme Court's opinions in *Mensing*, 564 U.S. 604, and *Bartlett*, 570 U.S. 472 recognize straightforward instances of impossibility preemption. The plaintiffs alleged that state law required the defendants, generic drug manufacturers, to add stronger warnings to their labels. *Mensing*, 564 U.S. at 609; *Bartlett*, 570 U.S. at 475. Federal law not only did not *require* this stronger warning, it did not *allow* a stronger warning, since the FDCA prohibits generic drug warning labels from departing from the branded label. *See* 21 U.S.C. §§355(j)(2)(A)(v), (j)(4)(G).

Because federal law prohibited them from changing the warning, satisfying the state-law duty to strengthen the warning was impossible. *Mensing*, 564 U.S. at 618; *Bartlett*, 570 U.S. at 480. That holding is obviously compatible with Appellants' argument, because the state-law and federal-law duties were not parallel. The Supreme Court expressly recognized this crucial distinction in *Bartlett*.

*Bartlett* involved an FDA-approved medication, sulindac, that remained FDA approved at the time of the plaintiff's lawsuit. Unlike ranitidine, sulindac was never subject to any recall or withdrawal, even after FDA "completed a comprehensive review of [sulindac's] risks and benefits." *Bartlett*, 570 U.S. at 478 (citation omitted). Nor did the *Bartlett* plaintiffs allege or ask the jury to find that "new evidence concerning sulindac that had not been made available to FDA rendered sulindac so dangerous" as to violate the federal misbranding statute. *Id.* at 487 n.4. Unlike here, there was no allegation that federal law ever imposed a requirement to stop selling sulindac.

Even though federal law did not require the defendant to stop selling, the plaintiffs argued that preemption failed as a defense because they were free to choose to stop selling. This argument—focused on the option, but not compulsion, to stop selling—is what the *Bartlett* Court rejected. It noted that complying with both duties was not "literally impossible," since they could have chosen "not to make [sulindac] at all." *Bartlett*, 570 U.S. at 487, n.3 & 488. It agreed that federal law does not

39

require drug companies to keep selling their FDA-approved drugs, but reasoned that if a defendant's *option* to stop-selling was enough to overcome impossibility preemption, the doctrine would be a dead letter. *Id.* Where a drug manufacturer was *complying* with federal law, the Court refused to reach a result that would require the manufacturer "to cease acting altogether in order to avoid [state law] liability." *Id.* at 488.

The distinction between *Bartlett* and this case is plain and dispositive. In *Bartlett* the plaintiffs argued that state tort law required a drug manufacturer to either (a) alter its warning label in direct violation of federal law or (b) because the label violated state (but not federal) law*,* pull the drug from the market. Here, by contrast, Appellants have alleged that the FDCA *prohibited* Defendants from selling ranitidine *and* that state law also imposed a duty not to sell it.

To the extent there were any doubt that this distinction is material, the Supreme Court removed it in *Bartlett* itself. The Court expressly noted that its decision was *not* addressing "the rare case in which state or federal law actually requires a product to be pulled from the market." 570 U.S. at 487 n.3. When the Supreme Court says it is not deciding a question, it necessarily believes that the question held open is not controlled by its holding. Any argument by Defendants that the distinction is irrelevant ignores the express views of the Supreme Court.

It also ignores what the original public meaning of the Supremacy Clause teaches. Appellants' claims assert that state tort law imposed on Defendants a duty not to sell their unreasonably dangerous product. The complaint further alleges that the FDCA imposed the same obligation. If the FDCA is viewed as a later-in-time law and the state tort claims are treated as an earlier-enacted statute, there is no plausible argument that the latter impliedly repeals the former. A later statute saying "stop selling ranitidine" obviously does not work an implied repeal of an earlier statute saying "stop selling ranitidine." That originalist framing similarly explains why *Bartlett* was correct and distinguishable. A later statute commanding "do not change the sulindac label" does work an implied repeal of an earlier statute saying "stop selling sulindac *because* it has a misleading label."

### D. The District Court's Reasoning Is Flawed.

The district court dismissed as categorically "irrelevant" the fact that the state-law duty is parallel to requirements the FDCA imposes, noting that the Supreme Court cases finding no preemption for parallel claims—"*Reigel*, *Bates*, and *Lohr*"—were express preemption cases and "did not address impossibility preemption." MDL.Dkt.2512 at 36 (referring to *Bates*, 544 U.S. 431; *Riegel* 552 U.S. 312, and *Lohr*, 518 U.S. 470). But the basic logic of those cases—where the state and federal duties are identical, there is no preemption—is not confined to express preemption cases. If anything, that logic applies *more* strongly where a defendant invokes

implied possibility preemption, which imposes a much higher bar. *Bates*, *Riegel*, and *Lohr* each involved statutory clauses that invalidated state-law requirements that differed *in any way* from federal requirements. *See* 7 U.S.C. §136v(b) (pesticides, "in addition to or different from"); 21 U.S.C. §360k(a)(1) (medical devices, "different from, or in addition to"). If state and federal law differed, state law was preempted. If a state claim would survive preemption under those stringent express preemption clauses, then it cannot be preempted by implied impossibility preemption.[12]

The district court further justified its decision by reasoning that Plaintiffs' theory would "render pre-emption caselaw meaningless," because: "If Plaintiffs' position were accepted, a plaintiff could avoid pre-emption simply by asserting, for example, that a drug's labeling was 'false or misleading in any particular' or that the drug was 'dangerous to health when used' as prescribed. MDL.Dkt.2512 at 28 (quoting 21 U.S.C. §352(a)(1), (j)). The district court is mistaken. It is not enough merely to "assert" that the FDCA's definition of misbranding is satisfied. That legal

---

[12] Even taken on its own terms, the district court's reasoning fails because the Supreme Court has looked to *Reigel*, *Bates*, and *Lohr* time and again in its impossibility preemption cases on pharmaceuticals. *See, e.g.*, *Bartlett*, 570 U.S. at 482, 487 & n.4, 492-93 (citing *Riegel* once, *Lohr* once, and *Bates* six times, including when discussing "parallel claims" in footnote 4); *Wyeth*, 555 U.S. at 565, 567, 574, 577, 579, 582, 587 (citing *Riegel* twice, *Lohr* three times in the majority and twice in a concurrence, and *Bates* in the majority and both concurrences).

conclusion must be plausibly supported by factual content.  *See Iqbal*, 556 U.S. at 678.  That conclusion is more than plausible on the facts here, including that FDA—relying on science not previously known to the agency—took quick action to make sure no American would ever be exposed to ranitidine's dangers again.

Further, as already noted, *Mensing* and *Bartlett* did *not* include any suggestion that federal law required defendants to stop selling the drugs in question.  By contrast, the complaint here alleges precisely that, a distinction that *Bartlett* expressly noted was material.  It hardly renders *Mensing* and *Bartlett* "meaningless" to allow an alternative theory—uniquely supported by the facts of this case—that *Bartlett* expressly left untouched.

The district court took no issue with the definition of misbranding under the FDCA; and it assumed that the complaint pleaded facts sufficient to show that ranitidine was "misbranded."  MDL.Dkt.2512 at 30.  Nonetheless, the court ruled that the federal misbranding statute was "of no matter" because only the United States, not a private plaintiff, can enforce it.  *Id.* at 28; *see also* MDL.Dkt.2513 at 31-32 (same reasoning).  That is a truthful irrelevancy.  Appellants do not seek to enforce the FDCA.  There is no claim, in substance or in form, titled "private right of action under the Food, Drug, and Cosmetics Act."  There is not even a state-law claim—such as negligence *per se*—with an element that incorporates the FDCA.

Rather, the claims are for design-defects, a cause of action that would exist even if the FDCA did not.

## III. The FDCA Does Not Preempt The Amended Claims Because They Rest On State Law Requirements That Defendants Could Have Fulfilled.

The district court also dismissed amended claims that all agree were predicated solely on actions the Generic Defendants could have taken unilaterally. It reasoned that if any aspect of a state-law requirement conflicted with federal law, *every requirement*—even those that did not conflict—was likewise preempted. This holding was plainly erroneous because it defies the canonical rule for implied conflict preemption repeated time-and-again by the Supreme Court and this Court that "state law is pre-empted *to the extent* that it actually conflicts with federal law." *English*, 496 U.S. at 79 (emphasis added).[13]   That rule flows from the text of the

---

[13] *See also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("state law is naturally preempted *to the extent of any conflict* with a federal statute" (emphasis added)); *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) ("pre-emption may occur to the extent that state and federal law actually conflict"); *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987) ("federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law"); *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985) ("state law is nullified to the extent that it actually conflicts with federal law"); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ("state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law"); *Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 478 (1984) ("because the Michigan Act ... 'stands as an obstacle ....' [t]o that extent, therefore, the Michigan Act is pre-empted" (citation omitted)); *Maryland v. Louisiana*, 451 U.S. 725, 747 (1981) ("a state statute is void to the extent it conflicts with a federal

Supremacy Clause itself, which casts aside "any Thing" in state law that is "to the contrary" of federal law—not *all* things, contrary or not. U.S. Const. art. VI, cl. 2.

### A. Because Complying With The Specific Duties Alleged Was Possible, Impossibility Preemption Does Not Bar Any AMPIC Claim.

All this Court need conclude to vacate the district court's order is that (1) impossibility preemption does not apply if it is *possible* not to breach particular state-law duties, and (2) accepting the pleadings as true, the Generic Defendants are alleged to have breached such duties.

### 1. Under impossibility preemption, whenever a defendant can take some action to comply with a state law duty, it can be liable for failing to take that specific action.

Supreme Court and Eleventh Circuit precedent demonstrates that conflict preemption analysis must be highly granular. Even when some "subsections of" a state law conflict with federal law, "an *entire* state statute is not preempted [just] because *some* of its provisions may actually conflict with federal law." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1129 (11th Cir. 2004) (emphasis added). Even when "it is [not] always possible to comply" *entirely* with both federal and state law, "the mere possibility that a claim based on one of the seventeen prohibited practices set forth in the Florida Act might be preempted by [federal law] is not enough for us to conclude that [a particular Florida claim] is preempted." *Id.* at

---

statute"); *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1269 (11th Cir. 2000) ("[T]he Florida program is preempted to the extent there is a conflict.").

1126-27.  To the contrary, courts must "analyze conflict preemption on a provision-by-provision basis," rather than "adopt a broad view of conflict preemption."  *Id.* at 1129 n.2.  The claims here are based on common law, but that is a distinction without a difference for purposes of the Supremacy Clause.  *See Riegel*, 552 U.S. at 323-25 (addressing common-law duties).

Common-law requirements are treated in a similarly granular way. Consider *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988).  The cause of action in that case was for a design defect, which imposes capacious duties, but the Court described the duty in quite particular terms when discussing preemption:

> Here the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications).

*Id.* at 509.  The Court did not describe the duty to design safe products in the abstract, and then ask whether United Technologies could fulfill every safety requirement the state law would impose—rather, the Court homed in on "the asserted basis of the contractor's liability" which was "the duty to equip helicopters with ... [an] escape-hatch mechanism."  *Id.*  The granular analysis was critical to the result, because the Court took conflict preemption seriously, and only a specific conflict at the level of actions the defendant should take would satisfy the defense of preemption.

46

The Court was even more granular in *Mensing*.  There, the Court held that "[t]he question for 'impossibility' [preemption] is whether the private party could independently *do* under federal law *what state law requires* of it."  *Mensing*, 564 U.S. at 620 (emphasis added).  By focusing on what the Defendant could "do," the Supreme Court clarified that the proper level of generality does not depend on how the state defines the common-law duty in the abstract—to act as a reasonably prudent person, to warn of dangers, to design reasonably safe products, etc.—but rather always turns on whether the conduct required by the law is possible.  Any other path leads to madness.  A defendant could argue that its duty to "comply with all state laws" is impossible in one area and use that to say federal law preempted state law in a different area.  There would be no sensible line between "comply with all state laws" and "act as a reasonably prudent person."

### 2.  Defendants could have satisfied each duty plaintiffs alleged.

First, Defendants could have shortened expiration dates.  All agree that Generic Defendants could unilaterally shorten expiration dates through the changes-being-effected process.  *See* 21 C.F.R. §314.94(a)(8)(iv).  Generic manufacturers of ranitidine have done so before, and the AMPIC pleads facts alleging they needed to do so again.  Take Sub-Count IV-4, the Arkansas claim.  This Sub-Count incorporates paragraphs 1152-53, which provide factual background: "[R]anitidine-containing products had expiration dating periods of one or two years, allowing

47

gradual accumulation of more and more NDMA.  A much shorter period of a matter of months would have ensured that ranitidine contained far lower levels of NDMA when consumed."  Plaintiffs alleged the duty: "Under Arkansas law, manufacturers have a duty of reasonable care to provide adequate warnings of risks of injury to someone who uses the product in a reasonably foreseeable manner."  MDL.Dkt.2759 ¶1192.  Next, breach: "[Ranitidine's] expiration date improperly instructed Plaintiffs that ranitidine-containing products were safe when consumed long after manufacture, when in fact the products degraded into NDMA over time."  *Id.* ¶1193.  Finally, causation: "Plaintiffs or their doctors would have read and heeded these warnings. As a result, Plaintiffs would not have consumed the volume of NDMA they ultimately did, and would not have been harmed by NDMA."  *Id.* ¶1194.

Taking the allegations as true and drawing all inferences in the Plaintiffs' favor, this claim alleges that if Defendants had put a proper expiration date on their drugs—which they could do—Plaintiffs "would not have been harmed by NDMA." The district court agreed that these facts stated a claim.  *See* MDL.Dkt.3717 at 27.

Second, Defendants likewise could have avoided liability under Count XI without violating federal law.  That Count explains that "ranitidine degrades into NDMA more quickly at higher temperatures" and "at higher humidity levels." MDL.Dkt.2759 ¶2436.  Defendants knew this, and were required to test for these conditions.  *Id.* ¶¶2437-39.  Defendants stored and transported both finished

ranitidine (for which an FDA-approved label governed storage and transportation conditions) and active pharmaceutical ingredient that it had not yet made into finished ranitidine (to which the label did not yet apply). *Id.* ¶2444-45. For *unfinished product* Defendants' contracts and practices allowed control over the storage and transportation, with no FDA label requirements, but Defendants allowed systematic overheating and exposure to humidity. For *finished product*, Defendants failed to implement policies to ensure their ranitidine was transported and stored within its labeled range, leading to widespread non-compliance—for example, Defendants shipped ranitidine through the mail, which has no temperature or humidity control. *Id.* ¶¶2446-50. Again, the district court agreed that these allegations state a claim. MDL.Dkt.3717 at 25-26.

Third, changing the container or reducing the number of pills would have reduced the amount of NDMA in the ranitidine Plaintiffs consumed. This is because "ranitidine degrades into NDMA more quickly at higher temperatures [and] at higher humidity levels." MDL.Dkt.2759 ¶1988. "The ranitidine-containing products Plaintiffs consumed had excessive levels of NDMA in part because they were subjected to high levels of humidity and were stored for a long period of time (often in humid locations such as bathrooms)." *Id.* ¶1990. One problem is that "[p]ill bottles with large numbers of units of ranitidine are likely to be stored for long periods by consumers after the seal is broken. This exposes the remaining units to

humidity over time, which produces NDMA." *Id.* ¶1991. To mitigate this safety issue, Plaintiffs allege that Defendants could have "[p]lac[ed] each unit of ranitidine in a blister pack or similar individually packaged container [to] ensure humidity control until the consumer used each unit," or "[r]educ[ed] the number of units of ranitidine in each bottle to a low number [to] ensure the unused units were subject to humidity for only a shorter time period, since consumers would purchase new bottles more frequently." *Id.* ¶1992. Failing to do so was negligent.

Fourth, adhering to the state-law duties to reduce the number of pills in a bottle or to use a blister pack could have been done unilaterally. Generic products need not have the same container as a branded drug. *See* 21 C.F.R. §314.94(a)(8)(iv) (requiring sameness as to the label only). These changes could be done either through an annual report or the CBE process. For blister packs, FDA's Guidance document explains that a "change in the container closure system of unit dose packaging (e.g., blister packs) for nonsterile solid dosage form drug products" is a *minor* change requiring only an update in an annual report. FDA, *Guidance for Industry, Changes to an Approved NDA or ANDA*, Revision 1, at 23 (Apr. 2004), https://www.fda.gov/media/71846/download. An annual report is also appropriate for "changes in the container closure system of solid oral dosage form drug products ... as long as the new package provides the same or better protective properties" and has been used in a similar drug—if it has never been used before, or an applicant is

unsure, "the applicant has the option of submitting the change for a single NDA or ANDA using the higher recommended reporting category"—*i.e.*, to submit the change as a CBE change rather than in the annual report.  *Id.* at 34.

Even if that were incorrect, a "change to or in a container closure system, except as otherwise provided for in this guidance, that does not [adversely] affect the quality of the drug product" can be made via the CBE process.  *Id.* at 21.  The *only* kind of container change requiring FDA pre-approval is a change from "a single unit dose container" to "a multiple dose container system" for "sterile drug products."  *Id.* at 20-21.  That provision makes sense—sterile products depend on containers more, and an increase in dosage presents a risk.  It doubly does not apply to ranitidine (a non-sterile product) seeking a move in the safer direction from a multiple-dose container to a single-dose blister pack.

Fifth, some states[14] impose a duty to test products, and Generic Defendants do not contest that they could have tested ranitidine unilaterally.  Federal regulations *required* testing.  *See* 21 C.F.R. §211.166(a).  A generic manufacturer can fulfill its duty to test "without the Federal Government's special permission or assistance" by

---

[14] As relevant here, Texas recognizes this claim, MDL.Dkt.2759 ¶¶1978-83, and Appellants Smart and Reyna allege claims under Texas law.  *See* Smart.Dkt.7 & Reyna.Dkt.5.

unilaterally changing its testing protocol pursuant to extant FDA regulations. *Mensing*, 564 U.S. at 623-24.  That is all that is required to avoid preemption.

State law can hold the Generic Defendants liable for failing to meet their duty in the five ways outlined above because federal law clearly allowed them to meet the duty.  The district court's contrary argument was erroneous.

## B.  The District Court's Holding That Preemption Applies Whenever *Any* Duty Is Impossible to Satisfy Is Erroneous.

The district court's preemption ruling depends on a flawed reimagination of how the common law operates.  On the district court's view, "there are no specific causes of action for failure to warn through proper expiration dates, negligent product containers, negligent storage and transportation, or negligent failure to test." MDL.Dkt.3750 at 36.  Without "specific causes of action," the court decided it "must analyze the Plaintiffs' claims for pre-emption purposes using the legal duties for failure-to-warn and negligence."  *Id.* at 36-37.

The argument amounts to the position that because common-law negligence, for instance, imposes a duty to behave "reasonably," courts cannot consider each *specific* instance of unreasonable behavior as *independent* breaches that state a viable claim.  On that view, either a defendant can take *all* of the reasonable actions imposed by state law or common-law negligence is facially preempted in all applications.  To illustrate the absurdity of this all-or-nothing position, consider a car with a defective steering wheel *and* defective tires.  Must a plaintiff allege *both*

defects to state a claim for her injuries?  Of course not.  She is free to focus on the defective steering wheel without incurring the time and litigation expense of pleading and proving that the tires were also out of compliance with state law. Accordingly, whether federal law creates a shield to liability for defective tires would be irrelevant under her theory that the steering wheel was defective.  Just as in *Boyle*, the proper question for preemption is "the asserted basis of the [manufacturer's] liability" not any *other* feature that violated state law.  *Boyle*, 487 U.S. at 509.

The absurd results are well-illustrated by this case.  The district court held that all claims against the Generic Defendants were preempted, because the Generic Defendants could not eliminate NDMA from ranitidine, and the NDMA-reducing-measures alleged in the complaint would not make ranitidine fully safe.  If that were right it would apply to Brand Manufacturers too.  The district court dismissed design-defect claims against the Brand Manufacturers, holding that they could not unilaterally redesign ranitidine.  MDL.Dkt.2532.  But, it allowed *other* design defect claims (based on a warnings or package design theory) to move forward.  If the district court's logic for the generics were correct, it would preempt *all* design defect claims against the Brand Manufacturers.  After all, the state law design-defect standard was not possible to fully meet without redesigning ranitidine, which they could not do.  Since they could not avoid all liability for design defects, all of design

defect law should be preempted for them too.  The district court's ruling is absurd, since it would make preemption turn not on the impossibility of meeting the state-law duty the plaintiff alleges defendant breached, but on identifying any state-law duty, pleaded or not, that the defendant could *not* satisfy (even if it could satisfy others).  That backwards approach defies preemption law and would essentially eliminate all tort claims against any regulated entity.

### C.  Generic Defendants Could Have Warned Through FDA.

Though Generic Defendants could not change the cancer warnings on ranitidine, they could have warned FDA, and by doing so, conveyed warnings indirectly to consumers.    MDL.Dkt.2759  ¶¶1371-1510.  Under common law principles, where warning a third-party is the best way to warn an end user, a manufacturer is obligated to warn that third party. Thus, Generic Defendants had a duty to warn, which "include[s] the duty to warn FDA, if that is the sole permissible mechanism for publicizing the additional risks ....  Such a duty to convey warnings to a third party that can reasonably be expected to warn the consumer is recognized in other contexts." *Coleman v. Medtronic, Inc.*, 223 Cal. App. 4th 413, 429 (Feb. 3, 2014), *ordered published* 331 P.3d 178 (Cal. 2014) (citing cases).  Subsequent cases have followed *Coleman*. *E.g.*, *Mize v. Mentor Worldwide LLC*, 51 Cal. App. 5th 850, 862 (2020). This general and well-recognized duty includes a more specific "requirement to file adverse event reports with the FDA" or file a citizen's petition,

or send them a letter, "if that is the only available method to warn doctors and consumers" about the dangers of a medical product. *Coleman*, 223 Cal. App. 4th at 429.

The most recent explication of these principles came from the Connecticut Supreme Court, which exhaustively analyzed the rulings of every jurisdiction before adopting the majority view that manufacturers do have a duty to warn through FDA. Though "the healthcare provider typically will be" the best person to warn "if there are no upstream obstructions to the flow of information about the known dangers of the product," where "such obstructions exist, we cannot perceive why the legislature would have wanted to bar juries from looking elsewhere to identify other persons or entities that, as a factual matter, are in the best position to take or recommend precautions; any other construction would allow manufacturers to evade their duty to prevent foreseeable harm to users by withholding the necessary information from those persons or entities in a position to ensure that it reaches the end user." *Glover v. Bausch & Lomb, Inc.*, 275 A.3d 168, 183 (Conn. 2022).

The cases applying *Coleman* have generally been medical device cases, but there is no reason the logic should not apply equally well to Generic Defendants. In both contexts, the defendant cannot warn the plaintiff directly because of federal preemption. But, in both contexts, the defendant can warn FDA, and doing so would

effectively reach the plaintiff, which is all that is required to be cognizable under many states' laws. *See* MDL.Dkt.2759 ¶¶1371-1510 (alleging Count V in 15 states).

The district court swept away this majority rule, holding that all such claims are preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). But *Buckman* does no such thing. In *Buckman*, the fraud theory was a consulting company told FDA that a manufacturer intended to use bone screws in long bones, but actually planned to use the screws in spinal fixation. After FDA approved the use in long bones, the screws were in fact used off-label in spines, which caused plaintiffs' injuries. Unlike "traditional state tort law which had predated the federal enactments," the plaintiffs' claims were parasitic on "the existence of these federal enactments." *Id.* at 353. Nothing whatsoever needed to be wrong with the screws for the fraud claim to succeed—it turned "solely [on] the violation of ... FDCA disclosure requirements." *Id.* at 352-53. Here that is not true. This is a traditional tort claim in which Appellants will need to demonstrate that the product caused their cancer. And it derives 100% from state law, not federal law. No federal regulation is necessary or sufficient for the claim. *Buckman* does not preempt traditional state tort claims merely because they involve communicating with FDA. The Ninth Circuit has squarely held that Buckman does not preempt failure to warn through FDA claims. *Stengel*, 704 F.3d at 1234.

The district court misapplied this Court's precedent in finding preemption.  In *Mink*, this Court held that a state-law claim based on "alleg[ations] [that] a manufacturer failed to tell FDA those things required by federal law" was preempted.  860 F.3d at 1330.  But here Plaintiffs allege that Defendants failed to tell FDA things required by *state law*.  Indeed, some things required by state law—"ordinary correspondence" with FDA about the risks of Zantac—were allowed, but not required by federal law.  MDL.Dkt.2759 ¶1412.  *Mink* also held that claims were preempted "insofar as [the defendant's] duty is owed to the FDA" and "[plaintiff's] theory of liability is not one that state tort law has traditionally occupied."  860 F.3d at 1330.  But here, the duty was not "owed to the FDA," but to consumers; it could be satisfied by warning FDA.  *See* MDL.Dkt.2759 ¶1408.  This third-party intermediary warning theory is an application of traditional tort law that applies outside the pharmaceutical context.

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed, and the case remanded for further proceedings.

Dated: April 10, 2024    Respectfully submitted,

                */s/ Ashley Keller*

Robert C. Gilbert       Ashley Keller
KOPELOWITZ OSTROW FERGUSON  KELLER POSTMAN LLC
WEISELBERG GILBERT     150 N. Riverside Plaza, Suite 4100
2800 Ponce de Leon Blvd,   Chicago, IL 60606
Suite 1100        Tel: (312) 741-5222
Coral Gables, FL 33134    ack@kellerpostman.com
Tel: (305) 384-7270
gilbert@kolawyers.com

                Noah Heinz
                KELLER POSTMAN LLC
                1101 Connecticut Ave., NW,
                Suite 1100
                Washington, DC 20036
                noah.heinz@kellerpostman.com

                *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,948 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: April 10, 2024

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

On April 10, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiffs-Appellants*