No. 21-12618

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

FRANK CHANDLER, *et al.*,

*Plaintiffs-Appellants*,

v.

GLENMARK PHARMACEUTICALS, INC. USA, ET AL.,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MDL No. 2924

## GENERIC DEFENDANTS-APPELLEES'
## ANSWERING BRIEF IN GENERICS-ONLY APPEAL

**HOLLAND & KNIGHT LLP**
Amy McVeigh
Daniel Winters
Thomas Yoo
400 South Hope Street, 8th Floor
Los Angeles, CA 90071
amy.mcveigh@hklaw.com
daniel.winters@hklaw.com
thomas.yoo@hklaw.com

*Counsel for Glenmark Pharmaceuticals
Inc., USA and Glenmark Pharmaceuticals
Ltd.*

*Additional counsel listed on following
pages*

Neal Seth
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-4179
nseth@wiley.law

*Counsel for Ajanta Pharma Ltd., Ajanta Pharma USA Inc., Torrent Pharma Inc., and Heritage Pharmaceuticals, Inc.*

Paul J. Cosgrove
**UB GREENSFELDER LLP**
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
(513) 698-5000
pcosgrove@ubglaw.com

Georgia Hatzis
**UB GREENSFELDER LLP**
1660 W. 2nd Street, Suite 1100
Cleveland, Ohio 44113
(216) 583-7000
ghatzis@ubglaw.com

*Counsel for Amneal Pharmaceuticals LLC & Amneal Pharmaceuticals of New York, LLC*

Terry Henry
Melissa F. Murphy
**BLANK ROME LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
(215) 569-5334
THenry@BlankRome.com
MFMurphy@BlankRome.com

*Counsel for Apotex Corp.*

Kevin M. Bandy
**UB GREENSFELDER LLP**
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
(513) 698-5000
kbandy@ubglaw.com

*Counsel for Aurobindo Pharma USA, Inc., and Aurohealth LLC*

John R. Ipsaro
**UB GREENSFELDER LLP**
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
(513) 698-5104
jipsaro@ubglaw.com

*Counsel for Dr. Reddy's Laboratories,
Inc., Dr. Reddy's Laboratories Limited
and Dr. Reddy's Laboratories SA*

Geralyn M. Passaro
**LITCHFIELD CAVO LLP**
600 Corporate Drive
Suite 600
Fort Lauderdale, FL 33334
(954) 689-3000
passaro@litchfieldcavo.com

*Counsel for Hikma Pharmaceuticals
USA, Inc. and Hikma Pharmaceuticals
International, Ltd.*

Jason Reefer
**PIETRAGALLO GORDON
ALFANO BOSICK & RASPANTI,
LLP**
301 Grant Street, Suite 3800
Pittsburgh, PA 15219
(412) 263-2000
JMR@Pietragallo.com

*Counsel for Mylan Institutional LLC,
Mylan Inc., Mylan Pharmaceuticals
Inc., Ranbaxy Inc., Sun Pharmaceutical
Industries, Inc., and Sun
Pharmaceutical Industries, Ltd.*

Asher A. Block
**LEWIS BRISBOIS BISGAARD &
SMITH LLP**
550 E. Swedesford Road
Suite 270
Wayne, PA 19087
(215) 977-4100
asher.block@lewisbrisbois.com

*Counsel for Granules USA, Inc.
and Granules India Ltd*

Robert F. Elgidely
**FOX ROTHSCHILD LLP**
One Biscayne Tower
2 South Biscayne Boulevard,
Suite 2750
Miami, FL 33131
(305) 442-6543
relgidely@foxrothschild.com

*Counsel for Lannett Company,
Inc.*

Jennifer Snyder Heis
**UB GREENSFELDER LLP**
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
(513) 698-5058
jheis@ubglaw.com

*Counsel for PAI Holdings, LLC, f/k/a
Pharmaceutical Associates, Inc.*

Donald R. McMinn
**HOLLINGSWORTH, LLP**
1350 1 Street NW
Washington, DC 20005
(202) 898-5800
dmcminn@hollingsworthllp.com

*Counsel for Sandoz Inc.*


Arthur J. Liederman
Nicole M. Battisti
**MORRISON MAHONEY LLP**
Wall Street Plaza
88 Pine Street
Suite 1900
New York, NY 10005
(212) 825-1212
aliederman@morrisonmahoney.com
nbattisti@morrisonmahoney.com


Richard M. Barnes
Sean Gugerty
**GOODELL DEVRIES LEECH &
DANN, LLP**
One South Street, 20th Floor
Baltimore, MD 21202

rmb@gdldlaw.com
sgugerty@gdldlaw.com

*Counsel for L. Perrigo Company, and
Perrigo Research & Development
Company*

John W. Eichlin
Douglas M. Tween
**LINKLATERS LLP**
1290 Avenue of the Americas
New York, NY 10104
(212) 903-9000
john.eichlin@linklaters.com
douglas.tween@linklaters.com

*Counsel for Strides Pharma, Inc.*


Lori Gail Cohen
Sara K. Thompson
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NW
Suite 2500
Atlanta, GA 30305
(678) 553-2385
cohenl@gtlaw.com
thompsons@gtlaw.com


Elliott H. Scherker
Brigid F. Cech Samole
**GREENBERG TRAURIG, LLP**
333 S.E. 2nd Ave, Ste 4400
Miami, FL 33131
scherkere@gtlaw.com
cechsamoleb@gtlaw.com

*Counsel for Teva Pharmaceuticals
USA, Inc., Teva Pharmaceutical
Industries Ltd., Ivax Pharmaceuticals,
LLC f/k/a Ivax Pharmaceuticals, Inc.,
Actavis Mid Atlantic, LLC and Watson
Laboratories, Inc.*

Clifford Katz
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com

*Counsel for Wockhardt USA LLC
and Wockhardt Ltd.*

Nichole M. Mooney
**DEAN, MEAD, EGERTN,
BLOODWORTH, CAPOUANO &
BOZARTH, P.A.**
Post Office Box 2346
Orlando, Florida 32802
(407) 841-1200
nmooney@deanmead.com

*Counsel for Zydus Pharmaceuticals
USA, Inc. and Cadila Healthcare, Ltd.*

No. 21-12618

*Chandler v. Glenmark Pharmaceuticals, Inc. USA, et al.*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Generic Defendants-Appellees hereby certify that the previously-filed Certificate remains correct.

Dated: July 25, 2024                        Respectfully submitted,

                                             */s/ Thomas J. Yoo*

C-1 of 1

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Generic Defendants-Appellees respectfully request oral argument because of the extensive procedural history and issues involved in the MDL proceeding and in this appeal.  Oral argument will assist the Court in resolving these issues.

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CONTENTS........................................................................ ii

STATEMENT OF JURISDICTION..........................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE ISSUES.............................................................5

STATEMENT OF THE CASE ................................................................6

    I. Overview of Generic Pharmaceutical Industry .................................6

        A.    New Drug Applications (NDAs) for Brand-Name Drugs ...................6

        B.    Abbreviated New Drug Applications (ANDAs) for Generic Drugs.....6

        C.    The "Duty of Sameness"................................................................7

    II.      Background Facts Alleged in Plaintiffs' Master Complaints ..............8

    III.    Course of Proceedings and Disposition Below...................................10

        A.    The Creation of the MDL....................................................................10

        B.    The MPIC ..........................................................................................11

        C.    The District Court Dismissed all Claims in the MPIC as Preempted ........................................................................................12

        D.    The *Cartee* Appeal ...........................................................................15

        E.    The Allegations in the AMPIC...........................................................16

        F.    Dismissal of the AMPIC based on Preemption Grounds....................17

        G.    Appeals and Entry of Judgment .........................................................19

STANDARD OF REVIEW ..................................................................19

SUMMARY OF THE ARGUMENT ....................................................19

ARGUMENT .......................................................................................22

    I.      The District Court Had Subject-Matter Jurisdiction ............................22

    II.     The District Court Correctly Dismissed the MPIC's State-Law
          Claims Against Generic Defendants ....................................................26

        A.     The District Court Correctly Concluded that Federal Law
              Preempts Plaintiffs' Claims Against Generic Defendants in the
              MPIC ...............................................................................................26

        B.     Plaintiffs' Attempts to Distinguish *Mensing* and *Bartlett* are
              Unavailing ......................................................................................34

    III.    The District Court Correctly Concluded that Federal Law
          Preempts the State-Law Claims Against Generic Defendants in the
          AMPIC .............................................................................................44

        A.     The District Court Properly Rejected Plaintiffs' Argument that
              "Sub-Duties" Should Control the Preemption Analysis ....................44

        B.     Plaintiffs Misconstrue the Applicable Preemption Case Law ...........46

        C.     "Pruning" Plaintiffs' Claims Violates Basic *Erie* Principles..............50

        D.     Plaintiffs' Arguments are Belied by their Pleadings..........................52

    IV.    Federal Law Also Preempts Plaintiff's Failure-to-Warn-Through-
          the-FDA Claim .................................................................................55

CONCLUSION ...................................................................................57

CERTIFICATE OF COMPLIANCE.................................................58

CERTIFICATE OF SERVICE ..........................................................59

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*In re 21st Century Oncology Customer Data Sec. Breach Litig.*,
  380 F. Supp. 3d 1243 (M.D. Fla. 2019).............................................................24

*Allbright v. Teva Pharm. USA, Inc.*,
  290 F. Supp. 3d 1321 (S.D. Fla. 2017).............................................................28

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005)....................................................................................43, 44

*Bell v. Publix Super Markets Inc.*,
  982 F.3d 468 (7th Cir. 2020) ............................................................................24

*Brinkley v. Pfizer, Inc.*,
  772 F.3d 1133 (8th Cir. 2014) ..........................................................................28

*Bryan v. CEO DeKalb Co. v. Jones*,
  575 F.3d 1281 (11th Cir. 2009) ........................................................................41

*\*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001).....................................................................22, 36, 51, 56

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
  479 U.S. 272 (1987)...........................................................................................48

*Carson v. Monsanto Co.*,
  92 F.4th 980 (11th Cir. 2024) .....................................................................43, 44

*Cliff v. Payco General American Credits, Inc.*,
  363 F.3d 1113 (11th Cir. 2004) ...................................................................48, 49

*Club Madonna Inc. v. City of Miami Beach*,
  42 F.4th 1231 (11th Cir. 2022) ........................................................................26

---

[1] Pursuant to 11th Cir. R 28-1(e), the cases upon which Generic Defendants primarily rely on are marked with an asterisk (*).

*In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*,
756 F.3d 917 (6th Cir. 2014) ...................................................................28, 40, 44

*Demahy v. Schwarz Pharma, Inc.*,
702 F.3d 177 (5th Cir. 2012) ....................................................................28

*Douglas Asphalt Co. v. QORE, Inc.*,
657 F.3d 1146 (11th Cir. 2011) ...............................................................51

*Drager v. PLIVA USA, Inc.*,
741 F.3d 470 (4th Cir. 2014) ....................................................................28

*Eckhardt v. Qualitest Pharm., Inc.*,
751 F.3d 674 (5th Cir. 2014) ....................................................................28

*Ellis v. C.R. Bard, Inc.*,
311 F.3d 1272 (11th Cir. 2002) ................................................................36, 42

*English v. General Electric Co.*,
496 U.S. 72 (1990) .....................................................................................46, 47, 48

*In re Fosamax (Alendronate Sodium) Prod. Liab. Litig. (No. II)*,
751 F.3d 150 (3d Cir. 2014) .....................................................................28

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) .....................................................................................42

*Gardley-Starks v. Pfizer, Inc.*,
917 F. Supp. 2d 597 (N.D. Miss. 2013)....................................................33

*Gelboim v. Bank of America Corp.*,
574 U.S. 405 (2015).....................................................................................15, 19

*Guarino v. Wyeth*,
719 F.3d 1245 (11th Cir. 2013) ................................ 8, 19, 21, 26, 28, 43, 45, 51

*Healthpoint, Ltd. v. Ethex Corp.*,
273 F. Supp. 2d 817 (W.D. Tex. 2001) ...................................................37

*Hillman v. Maretta*,
569 U.S. 483 (2013).....................................................................................48

*Houston v. United States*,
   638 F. App'x 508 (7th Cir. 2016) ........................................................28

*Ingram v. CSX Transp., Inc.*,
   146 F.3d 858 (11th Cir. 1998) ............................................................25

*Johnson v. Teva Pharm. USA, Inc.*,
   758 F.3d 605 (5th Cir. 2014) ..............................................................28

*Lashley v. Pfizer, Inc.*,
   750 F.3d 470 (5th Cir. 2014) ..............................................................28

*Mensing v. Wyeth, Inc.*,
   588 F.3d 603 (8th Cir. 2009) ..............................................................32

*Metz v. Wyeth, LLC*,
   No. 8:10-CV-2658, 2011 WL 5024448 (M.D. Fla. Oct. 20, 2011)....................34

*Mink v. Smith & Nephew, Inc.*,
   860 F.3d 1319 (11th Cir. 2017) ......................................................22, 55

*Moretti v. Mutual Pharm. Co.*,
   852 F Supp. 2d 1114 (D. Minn. 2012)..................................................33

*Moretti v. PLIVA, Inc.*,
   No. 2:08-CV-00396, 2012 WL 628502 (D. Nev. Feb. 27, 2012) .....................33

*Mutual Pharm. Co., Inc. v. Bartlett*,
   570 U.S. 472 (2013)......................2, 3, 6-8, 13, 15, 21, 27, 29, 31, 39, 41, 45, 47

*Pediamed Pharms., Inc. v. Breckenridge Pharm., Inc.*,
   419 F. Supp. 2d 715 (D. Md. 2006)....................................................37

*PLIVA, Inc. v. Mensing*,
   564 U.S. 1058 (2011)......................................................................33

*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011).........................2, 7, 8, 12, 22, 26, 27, 29, 31, 32, 43, 47, 57

*Porter v. White*,
   483 F.3d 1294 (11th Cir. 2007) .........................................................34

*Salinero v. Johnson & Johnson*,
   995 F.3d 959 (11th Cir. 2021) .......................................................21, 50

*Strayhorn v. Wyeth Pharm. Inc.*,
   737 F.3d 378 (6th Cir 2013) ................................................................44

*Tsavaris v. Pfizer, Inc.*,
   154 F. Supp. 3d 1327 (S.D. Fla. 2016) ................................................28

*Tsavaris v. Pfizer, Inc.*,
   717 F. App'x 874 (11th Cir. 2017) .......................................................56

*United States v. Grimon*,
   923 F.3d 1302 (11th Cir. 2019) ...........................................................19

*United States v. Navarro*,
   551 F. Supp. 3d 380 (S.D.N.Y. 2021) .................................................37

*Wagner v. Teva Pharm. USA, Inc.*,
   840 F.3d 355 (7th Cir. 2016) ...........................................................1, 28

*Wis. Pub. Intervenor v. Mortier*,
   501 U.S. 597 (1991).............................................................................48

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Prac. & Prods. Liab. Litig.*,
   No 3:09-md-02100, 2015 WL 7272766 (S.D. Ill. Nov. 18, 2015)....................40

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
   808 F.3d 281 (6th Cir. 2015) ...............................................................28

*In re Zantac (Cartee & Williams)*,
   2022 WL 16729151 (11th Cir. Nov. 7, 2022) ......................3, 10, 11, 15, 16, 23

**Statutes**

21 U.S.C. § 331 ..........................................................................................30

21 U.S.C. § 337 ....................................................................................36, 42

21 U.S.C. § 351 ..........................................................................................35

21 U.S.C. § 352 ..........................................................................................32

21 U.S.C. § 355 ................................................................6

**Other Authorities**

21 C.F.R. § 314.50 ..........................................................6

21 C.F.R. § 314.70 ..........................................................7

21 C.F.R. § 314.80 ........................................................56

21 C.F.R. § 314.81 ........................................................56

21 C.F.R. § 314.94 ..........................................................7

21 C.F.R. § 314.150 ........................................................7

## STATEMENT OF JURISDICTION

These are appeals from 18 final judgments of the United States District Court for the Southern District of Florida in which the Plaintiffs named defendants who manufactured or sold the generic version of Zantac, ranitidine. The cases were consolidated for pretrial proceedings pursuant to 28 U.S.C. § 1407. MDL.Dkt.1.[2] The district court had diversity jurisdiction over the 18 civil actions. *See Bodey v. Amneal Pharms., LLC, et al.*, No. 9:21-cv-81169, Doc. 1 (S.D. Fla. July 1, 2021) (alleging "[j]urisdiction is proper upon diversity of citizenship"); *see* MDL.Dkt.887¶216 ("This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). In each of the actions there is complete diversity among Plaintiffs and Defendants . . . ."); MDL.Dkt.2759¶220 (same).

Final judgments were entered on November 15, 2021, and Plaintiffs filed timely notices of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

---

[2] This brief refers to MDL docket entries as "MDL.Dkt." Additionally, this brief refers to docket entries in this Court's appellate docket as "*Short Case Name*, CA11.Dkt." There are three appellate dockets cited in this brief: *Cartee,* Case No. 21-10305, *Chandler*, Case No. 21-12618, and *Williams*, Case No. 21-10306. In accordance with Eleventh Circuit Local Rule 28-5, this brief cites to all record documents, other than transcripts, using the document's internal pagination.

## INTRODUCTION

The appeals by these eighteen Plaintiffs-Appellants are a small subset of the thousands of appeals now before this Court from an MDL involving the heartburn medication Zantac and its generic equivalent, ranitidine. All MDL plaintiffs allege that Zantac and ranitidine have an inherent propensity to form a carcinogen, N-nitrosodimethylamine ("NDMA"), which they allege caused their cancer. Plaintiffs here brought actions naming only the manufacturers of generic ranitidine ("Generic Defendants"). Applying the Supreme Court's landmark *Mensing* and *Bartlett* opinions,[3] the district court held that Plaintiffs' state-law claims against Generic Defendants were barred by impossibility preemption.

The district court concluded that Plaintiffs' claims, in their initial pleading and an amended pleading, *all* turned on: (1) the alleged danger inherent in the design of every ranitidine product; and (2) the adequacy of those medications' labeling. The claims thus conflicted with the federal "duty of sameness" that requires generic drugs to have the exact same design and warning labeling as the equivalent brand name product. It was impossible for Generic Defendants to "independently do under federal law what state law requires," namely, issue a warning or change ranitidine's basic design, so the claims are preempted. *Mensing*, 564 U.S. at 620, 624. And the

---

[3] *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472 (2013).

argument that Generic Defendants could have avoided liability without technically violating federal law if they simply stopped all sales of ranitidine products was addressed in *Bartlett*, which flatly rejected it as "incoheren[t]", "incompatible with . . . pre-emption jurisprudence", and "irrelevant" to the proper impossibility preemption analysis. 570 U.S. at 488–90.

After litigating through final judgment, Plaintiffs now claim for the first time that the district court lacked subject matter jurisdiction because the MDL actions merged. Plaintiffs are wrong. Their new position is contrary to that which Plaintiffs' counsel has taken in prior answers to this Court's jurisdictional questions, wholly inconsistent with the parties' and district court's treatment of the pleadings and the management of the actions, and—most significantly—was *considered and rejected* in this Court's careful analysis of the interplay between master and short-form complaints in a prior appeal taken from this action, *In re Zantac (Cartee & Williams)*, 2022 WL 16729151, at *1 (11th Cir. Nov. 7, 2022) (hereinafter, "*Cartee*").

On the merits, Plaintiffs fare no better. Their main preemption argument— that their initial state-law claims were that generic ranitidine should never have been sold, which they contend "parallels" federal misbranding law—fails because Plaintiffs' actual claims bear no resemblance to their belated characterization and, in any event, is irreconcilable with *Bartlett*. As the district court recognized, no

federal court has adopted the theory that generic-drug impossibility preemption can be defeated merely by alleging that a drug is "dangerous" or its labeling "misleading" and therefore is misbranded under federal law. Such allegations could be readily added to any product liability action involving generic medications, rendering *Mensing*, *Bartlett*, and the dozens of decisions applying them meaningless.

Plaintiffs also misrepresent the district court's ruling on the claims in their amended master pleading. The district court carefully analyzed the claims, requested supplemental briefing and argument on the precise state-law duty underlying each cause of action, and held that those state-law duties conflict with the federal "duty of sameness" and are preempted. There is no viable support for applying impossibility preemption to prune recognized causes of action down to leave only "sub-duties," and doing so would run counter to bedrock *Erie* principles as it would effectively create new and unrecognized state-law causes of action. The district court also correctly held that the Failure to Warn Through FDA claim was separately preempted under the Court's precedent because it arises from FDA reporting obligations whose enforcement is solely within the purview of FDA.

The district court's entry of judgment in these eighteen actions should be affirmed.

## <u>STATEMENT OF THE ISSUES</u>

1.  Did the district court correctly agree with all parties to this litigation—including Plaintiffs—that it had subject-matter jurisdiction based on diversity of citizenship?

2.  Did the district court properly dismiss Plaintiffs' state-law claims against the Generic Defendants, as pled in the Master Personal Injury Complaint ("MPIC") and adopted and incorporated into each individual Plaintiff's Short Form Complaint ("SFC"), as preempted?

3.  Did the district court correctly conclude that Plaintiffs' state-law claims against Generic Defendants, as pled in the Amended Master Personal Injury Complaint ("AMPIC") and adopted and incorporated into each individual Plaintiff's SFC, are preempted by federal law?

## STATEMENT OF THE CASE

I.    **Overview of Generic Pharmaceutical Industry**

A.    **New Drug Applications (NDAs) for Brand-Name Drugs**

Under the Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer may not market a new drug before receiving approval from the U.S. Food and Drug Administration ("FDA").   21 U.S.C. § 355(a).   For a new brand-name drug, manufacturers must submit a new drug application (NDA).   NDAs must include reports of clinical investigations, 21 U.S.C. § 355(b)(1)(A), relevant nonclinical studies, and "any other data or information" relevant to drug safety.   21 C.F.R. §§ 314.50(d)(2), (d)(5)(iv).   The NDA must also include "the labeling proposed to be used for such drug," 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50(c)(2)(i), and "a discussion of why the [drug's] benefits exceed the risks under the conditions stated in the labeling."   21 C.F.R. §§ 314.50(c)(2)(ix), (d)(5)(viii).

B.    **Abbreviated New Drug Applications (ANDAs) for Generic Drugs**

In 1984, Congress passed the Drug Price Competition and Patent Term Restoration Act, 98 Stat. 1585, known as the "Hatch-Waxman Act," creating a faster path for approval of generic drugs.   Under this Act, the FDA may approve a generic drug "without the same level of clinical testing required for approval of a new brand-name drug, provided the generic drug is identical to the already-approved brand-name drug in several key respects."   *Bartlett,* 570 U.S. at 477.   "[The Hatch-Waxman Act] allows manufacturers to develop generic drugs inexpensively, without

6

duplicating the clinical trials already performed on the equivalent brand-name drug." *Mensing*, 564 U.S. at 612.

Generic approval has three main requirements. First, the drug must be "chemically equivalent to the approved brand-name drug: it must have the same 'active ingredient' or 'active ingredients,' 'route of administration,' 'dosage form,' and 'strength' as its brand-name counterpart." *Bartlett*, 570 U.S. at 477 (quoting 21 U.S.C. §§ 355(j)(2)(A)(ii)–(iii)). Second, it must be "bioequivalent," meaning it has the same "rate and extent of absorption" as the brand-name drug. 21 U.S.C. §§ 355(j)(2)(A)(iv), (j)(8)(B). Third, the generic drug manufacturer must use "the same" labeling as the labeling approved for the brand-name drug. 21 U.S.C. § 355(j)(2)(A)(v).

## C.    The "Duty of Sameness"

Once a generic drug is approved, "the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" *Bartlett,* 570 U.S. at 477 (quoting 21 C.F.R. § 314.70(b)(2)(i)). "Generic manufacturers are also prohibited from making any unilateral changes to a drug's label." *Id*. (citing 21 C.F.R. § 314.94(a)(8)(iii)). Indeed, FDA approval may be withdrawn if the generic drug's label "is no longer consistent with that for [the brand-name] drug." 21 C.F.R. § 314.150(b)(10). Thus, the chief duty that federal

law imposes on a generic manufacturer is to keep its generic product the same as its brand-name counterpart. *Mensing*, 564 U.S. at 613; *see Guarino v. Wyeth*, 719 F.3d 1245, 1249 (11th Cir. 2013) (stating "generic manufacturers operate under a 'duty of sameness'").

Federal law preempts any state law claim that requires a generic manufacturer to violate the federal "duty of sameness" by changing the warnings or design of a generic drug. *Mensing*, 564 U.S. at 617–18; *Bartlett,* 570 U.S. at 486–87. All of Plaintiffs' claims must be viewed against the backdrop of the "duty of sameness" imposed by the FDCA.

## II.    Background Facts Alleged in Plaintiffs' Master Complaints

In 1983, the FDA approved the sale of prescription Zantac, the brand-name version of ranitidine. MDL.Dkt.887¶¶226,231,432. Starting in 1995, the FDA approved the sale of various forms of over-the-counter ("OTC") Zantac. MDL.Dkt.887¶¶233,237. When the patents on prescription and OTC Zantac expired, numerous generic drug manufacturers started to make generic ranitidine products in prescription and OTC forms. MDL.Dkt.887¶¶249–51.

Plaintiffs allege that ranitidine inherently and inevitably degrades into a probable carcinogen, NDMA. MDL.Dkt.887¶¶253,321,324,331. They claim that NDMA is inherent to ranitidine's molecular structure, is present at the point of manufacture, forms due to natural degradation at room temperature, and forms

8

independently in the body when ranitidine is digested. MDL.Dkt.887¶¶6,308. According to Plaintiffs, all ranitidine contains NDMA, and therefore all ranitidine is inherently dangerous and unreasonably unsafe. MDL.Dkt.887¶¶476–81.

On September 9, 2019, Valisure, a private online pharmacy, filed a Citizen Petition calling for the recall of all ranitidine products due to allegedly high levels of NDMA. MDL.Dkt.887¶285. Over the next few months, the FDA undertook its own testing of ranitidine from various manufacturers and found a range of NDMA levels: some samples had none, others were within the FDA's intake guideline of 96 ng/day, and a few registered NDMA above this guideline but still far below Valisure's findings. MDL.Dkt.6120:4,9.

In April 2020, the FDA requested manufacturers conduct a nationwide voluntary "market withdrawal" of all ranitidine products. MDL.Dkt.887¶301. Contrary to Plaintiffs' assertions, the FDA did *not* base that action on a finding that ranitidine products were misbranded or otherwise in violation of federal law. *Cf.* Plaintiffs' Initial Brief ("I.B.") at 6–7, 35–36. Rather, the agency cited to its legal authority to direct *either* a recall for a product that "violates provisions of the [FDCA]or presents a danger to health" *or* a market withdrawal "when a firm's removal or correction of a distributed product may not be immediately subject to legal action by FDA"—and clearly stated that it was requesting the latter. Letter of Janet Woodcock, U.S. Food & Drug Admin., Docket No. FDA-2020-P-0042 at 4-6,

11 (Apr. 1, 2020) (cited in MDL.Dkt.887¶301&n.47).  Indeed, the FDA has *never* found ranitidine products to be misbranded or in violation of federal law.

The Generic Defendants complied with the FDA's request for a voluntary withdrawal and Plaintiffs do not allege that Generic Defendants sold ranitidine after the withdrawal.  At all times relevant to this case, generic ranitidine was FDA-approved as safe and effective for use in accordance with its label.

**III.   Course of Proceedings and Disposition Below**

**A.   The Creation of the MDL**

After Valisure filed its Citizen Petition, Plaintiffs across the country began filing lawsuits related to their use of ranitidine.  MDL.Dkt.3750:3.  In February 2020, the U.S. Judicial Panel on Multidistrict Litigation created the Zantac multi-district litigation ("MDL") pursuant to 28 U.S.C. § 1407.  MDL.Dkt.3750:3-4.  The cases were consolidated for all pretrial purposes and transferred to the United States District Court for the Southern District of Florida (Rosenberg, J.).  MDL.Dkt.1. Thousands of Plaintiffs asserted claims for personal injury against various groups of defendants, including Generic Defendants.

To coordinate the adjudication of overlapping issues in the individual actions, "the parties filed a proposed order . . . known as Pretrial Order #31," which "was adopted and entered by the district court."  *Cartee*, 2022 WL 16729151, at *1; *see also* MDL.Dkt.876; MDL.Dkt.1496.  Pretrial Order #31 "'employe[d] the device of

a master complaint, supplemented by individual short-form complaints that adopt the master complaint in whole or in part.'" *Cartee*, 2022 WL 16729151 at *1 n.1. "The master complaint contained allegations common to all plaintiffs asserting the same types of claims, while the short-form complaints contained allegations specific to each individual plaintiff." *Id.*

### B.    The MPIC

In accordance with PTO 31, Plaintiffs filed an MPIC that named no plaintiffs and that "set[] forth allegations of fact and law common to the personal-injury claims," which individual Plaintiffs then incorporated by reference in their respective SFCs. MDL.Dkt.887:1. Notably, Plaintiffs expressly stated that: (1) the MPIC was "not intended to consolidate for any purpose the separate claims of the individual Plaintiffs in this MDL," MDL.Dkt.887:2, and (2) in each of the respective "*actions*" in the MDL, there is "complete diversity among Plaintiffs and Defendants." MDL.Dkt.887¶216 (emphasis added).

The MPIC brought twelve substantive and three derivative counts against Generic Defendants. *See* MDL.Dkt.2512:5,52. Each count incorporated allegations that: 1) NDMA formation is intrinsic to all ranitidine products; 2) the ranitidine molecule itself contains the constituent molecules to form NDMA; and 3) NDMA forms at room temperature and whenever ranitidine is digested. MDL.Dkt.887¶¶105–148. Each count alleged that Generic Defendants were liable

for failing to: 1) warn of the presence of NDMA; or 2) change the products' basic chemical design to eliminate the propensity to form NDMA. *See, e.g.*, MDL.Dkt.887¶456 ("Defendants had a continuing duty to warn Plaintiffs of dangers associated with ranitidine."); MDL.Dkt.887¶485 ("Defendants could have designed ranitidine-containing products to make them less dangerous."). Plaintiffs also alleged that ranitidine was misbranded, and therefore illegal to sell under federal law, but *only* because of labeling deficiencies. MDL.Dkt.887¶¶421–423  None of the counts alleged that state law prohibited Generic Defendants from selling ranitidine products due to the risks posed by NDMA.

### C.    The District Court Dismissed all Claims in the MPIC as Preempted

Generic Defendants filed a motion to dismiss the MPIC on preemption grounds.  On December 31, 2020, the district court granted that motion, dismissing all claims against the Generic Defendants as preempted.  *See* MDL.Dkt.2512:53.

The district court outlined the federal "duty of sameness" for generic drugs and the holdings of *Mensing* and *Bartlett* and concluded that state-law warning and design-based claims conflicted with that duty, such that it was impossible for a generic manufacturer to "independently do under federal law what state law requires of it." MDL.Dkt.2512:9–19 (citing *Mensing*, 564 U.S. at 620).  It also acknowledged *Bartlett*'s holding that while manufacturers might technically comply with both state and federal law by not making the products at all, such "stop-selling" arguments

12

cannot defeat preemption because a party "seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability."  MDL.Dkt.2512:16–17 (quoting *Bartlett*, 570 U.S. at 488).

Surveying federal law, the district court noted that *Mensing* and *Bartlett* have been consistently applied to dismiss "numerous categories of claims against generic drug manufacturers" at the pleading stage, *see* MDL.Dkt.2512:17–19, and concluded that they are equally dispositive here.  Thus, while Plaintiffs urged the court to disregard the claims as actually pled and instead view state law as flatly "prohibit[ing]" ranitidine's sale, *see* MDL.Dkt.2512:20; MDL.Dkt.1976:20–24, the court declined to do so.  It recognized that Plaintiffs' claims are "based on alleged defects in ranitidine products, product labeling, or other communications that [Generic Defendants] could not independently change while remaining in compliance with federal law," and therefore "are pre-empted" under *Mensing* and *Bartlett*.  MDL.Dkt.2512:28–29.[4]

The district court also rejected "Plaintiffs' theory that impossibility preemption can be avoided by showing that a drug is misbranded," a theory which it pointedly noted "[n]o court has adopted."  MDL.Dkt.2512:27.  References to

---

[4] The district court did not dismiss the warning or design allegations in the strict liability or negligent manufacturing defect counts as preempted, but dismissed them without prejudice as implausibly pleaded.  MDL.Dkt.2512:46.  Plaintiffs did not challenge the dismissal of the manufacturing defect counts on appeal.

misbranding cannot alter the preemptive impact of the federal duty of sameness; "[a] claim based on an allegation that a generic drug's labeling renders the drug misbranded is a pre-empted claim because the drug's manufacturer cannot independently and lawfully change FDA-approved labeling." MDL.Dkt.2512:27. Likewise, even in the face of an allegation that ranitidine's formulation rendered it misbranded, preemption applies because Generic Defendants could not independently change the drug's design. MDL.Dkt.2512:27. And, "*Mensing* and *Bartlett* further instruct that the ability to comply with both federal and state law by withdrawing misbranded ranitidine products from the market does not defeat pre-emption." MDL.Dkt.2512:27.

As further support for its ruling, the district court stressed that if plaintiffs could evade preemption merely by alleging that "a drug's labeling was 'false or misleading in any particular' or that the drug was 'dangerous to health when used' as prescribed," it would "render the vast body of pre-emption caselaw in the drug context, including binding Supreme Court decisions, meaningless." MDL.Dkt.2512:27 (quoting 21 U.S.C. §§ 352(a)(1), (j)).

The district court thus dismissed the design defect and failure to warn-based claims in the MPIC with prejudice but allowed Plaintiffs to re-plead narrow claims based on actions that the Generic Defendants could have taken unilaterally. MDL.Dkt.3715:53–54. The district court also separately dismissed various claims

against Brand, Retailer, and Distributor Defendants on preemption or other grounds. MDL.Dkt.2513; MDL.Dkt.2515; MDL.Dkt.2516.

### D.    The *Cartee* Appeal

Following the dismissals of the MPIC, individual plaintiffs Arthur Cartee and Marilyn Williams—represented by the same lead counsel as Plaintiffs here—filed amended SFCs pleading only those claims that the district court dismissed with prejudice, and then appealed. *Cartee*, 2022 WL 16729151, at *2–3. Brand Defendants moved to dismiss the appeals, arguing that: (1) the district court never dismissed the SFCs and voluntary dismissals without-prejudice are not final, appealable decisions, and (2) Cartee's and Williams' actions "merged" with the other actions in the MDL under Footnote 3 of *Gelboim v. Bank of America Corp.*, 574 U.S. 405, 413 n.3 (2015), so they could not appeal until all Plaintiffs' claims were resolved. *See Cartee*, CA11.Dkt.18:9–15; *Williams*, CA11.Dkt.36:11–19.

Cartee and Williams insisted that the actions had *not* been "merged," pointing out that nothing in the district court's pretrial orders or the MPIC itself "suggest[ed] that by incorporating MPIC allegations, personal-injury plaintiffs [merged] their *separate* actions into a *single* one." *Cartee*, CA11.Dkt.23:11–12; *accord Williams*, CA11.Dkt.45:12. In supplemental briefing, Cartee and Williams also argued that "multiple actions become a single action only when the parties are *joined*[,]" which can occur only via "a motion to join parties or through an amended pleading, but in

either scenario, the parties seeking joinder must meet the standard of Rule 20."
*Cartee*, CA11.Dkt.79:1–3.

This Court dismissed for lack of appellate jurisdiction on the Brands' *first*
argument: that Cartee and Williams "cannot unilaterally declare" their SFCs to be
dead and then appeal.  *Cartee*, 2022 WL 16729151, at *5.  The Court rejected any
notion of merger, holding that even though the district court had dismissed the
MPIC, Cartee's individual case was "still alive and pending" and would remain so
until the district court entered a "final ruling against *his operative complaint*—the
combination of the MPIC and his SFC—to put the last nail in the coffin of *his
action*." *Id.* (emphases added).

### E.    The Allegations in the AMPIC

In the AMPIC, Plaintiffs asserted claims against the Generic Defendants for
"Failure to Warn Through Expiration Dates," "Negligent Product Containers,"
"Negligent Storage and Transportation," "Negligent Failure to Test," and "Failure
to Warn Consumers Through the FDA."    MDL.Dkt.2759¶¶932–62,1371–
1405,1949–71,1984–98,2433–59.

All Plaintiffs' claims in the AMPIC were based on the same factual allegations
as those in the MPIC, including that ranitidine medications are inherently defective
due to their propensity to form NDMA and no ranitidine is safe to ingest.  *See, e.g.*,
MDL.Dkt.2759¶¶343,953.  While Plaintiffs alleged that the Generic Defendants

should have taken steps to shorten expiration dates, change containers, add testing, or store the products differently, they simultaneously contended that none of those steps would prevent NDMA formation and render ranitidine safe to consume. MDL.Dkt.2759¶¶347–384,389–390.

### F.    Dismissal of the AMPIC based on Preemption Grounds

Generic Defendants once again moved to dismiss based on preemption.[5]  In response, Plaintiffs *conceded* that the legal duties underlying their remaining state-law claims would require the Generic Defendants to change the warnings or design of the product and that the Generic Defendants could not do so independently under federal law.  MDL.Dkt.3750:31.  But they argued that their claims also included sub-duties that the Generic Defendants could meet *without* violating federal law, and that those sub-duties govern the preemption analysis.  MDL.Dkt.3750:31.  For example, Plaintiffs argued that the Generic Defendants could independently change their expiration dates under federal law, that the state-law duty to warn included within it a duty to warn of a cancer risk through an accurate expiration date, and that the

---

[5] Other defendant groups also moved to dismiss on preemption and other grounds. The district court granted the all-defendants' motion as to the Failure to Warn Through FDA claim, finding it preempted based on *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319 (11th Cir. 2017), and other persuasive precedent in this Circuit. MDL.Dkt.3715:9,41–43.

17

Generic Defendants could unilaterally change their expiration date. MDL.Dkt.3750:31.

The district court rejected Plaintiffs' "sub-duties" argument. The court determined that "there is no such *tort* as 'Negligent Choosing and Making of Containers' or 'Negligent Transporting and Storing of Products.'" MDL.Dkt.3750:33 (emphasis in original). The court noted that Plaintiffs provided no authority for their "sub-duty" argument other than the general state-law duty to sell a reasonably safe product. MDL.Dkt.3750:34. In fact, Plaintiffs acknowledged that their claims were "just" negligence claims and that they "are not trying to say there is such a granular cause of action. . . ." Instead, "[i]t is still going to be just the general common law failure to warn . . ." MDL.Dkt.3683:178,181.

Relying on Plaintiffs' concessions that they pleaded ordinary failure to warn and negligence claims, the district court found the claims rested on either a "duty to warn of the risks associated with the use of ranitidine" or else a "duty to use reasonable care." MDL.Dkt.3750:35–38. Because the Generic Defendants could not warn consumers of the alleged risks that ranitidine posed and could not correct the inherent design flaw that "remain[ed] at the center . . . of all of the Plaintiffs' claims," the claims were preempted. MDL.Dkt.3750:39–43.

### G.    Appeals and Entry of Judgment

Plaintiffs appealed the dismissal of the AMPIC, and, on November 1, 2021, the district court entered Rule 58(a) final judgments in the eighteen "Generic-Only" actions. MDL.Dkt.4595.  In issuing that judgment, the district court notably *rejected* Brand Defendants' argument that all actions in the MDL had temporarily "merged." MDL.Dkt.4595:21.  "[T]he merger doctrine is ultimately founded on the common-sense principle that if a party elects to waive an individual right, the party may do so," the court said. "Plaintiffs' express disavowal of the merger doctrine in their master pleadings" and the language of PTO 31 ruled out merger.

### STANDARD OF REVIEW

Whether the district court had subject-matter jurisdiction is a question of law reviewed *de novo*.  *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019).

This Court also reviews *de novo* a district court's order dismissing a claim or complaint, taking all well-pleaded facts as true and construing them in the light most favorable to the nonmoving party.  *See Guarino*, 719 F.3d at 1248.

### SUMMARY OF THE ARGUMENT

I.  This Court should reject Plaintiffs' new argument that the district court lacked diversity jurisdiction.  When cases are "consolidated for MDL pretrial proceedings," the default rule is that individual cases "retain their separate identities" for purposes of diversity jurisdiction.  *Gelboim*, 574 U.S. at 412.  The district court

followed routine MDL practice, and neither the court nor the parties intended to merge Plaintiffs' individual cases into one jurisdiction-destroying "action."

II.    The district court correctly concluded that the MPIC's warnings- and design-based state-law claims are preempted under *Mensing* and *Bartlett.* Plaintiffs' parallel misbranding theory—*i.e.*, that Generic Defendants could have complied with federal and state law by withdrawing ranitidine from the market earlier—cannot save their claims from preemption.  There is no foundation for the theory, as Plaintiffs never claimed that state law required ceasing all sales of ranitidine. Moreover, the misbranding theory was rejected in *Mensing* and *Bartlett* and multiple later decisions.  And even if Plaintiffs had pleaded a state-law "requirement" to stop selling (which they have not), the Supreme Court rejected a stop-selling argument in *Bartlett*.  570 U.S. at 488.

There is no basis to depart from that well-established precedent here.  No court has held that footnotes in *Bartlett* create an exception to preemption.  Even if they did, it would only apply to a "pure" design defect claim that did not consider the adequacy of the drug's labeling—and Plaintiffs have conceded they did not plead such a claim.  FDA actions in 2019 and 2020 do not alter the legal landscape; the agency never found ranitidine to be misbranded.  Finally, this Court should reject Plaintiffs' attempts to impose a new analytical framework for implied preemption

based on "basic logic" or reliance on inapposite express preemption decisions and disregard the controlling analytical framework set in *Mensing* and *Bartlett*.

III.    The district court correctly concluded that the AMPIC's claims against Generic Defendants are likewise preempted by federal law and that "sub-duties" are not "cognizable (and divisible) legal duties, let alone the duties to be used for comparison in federal pre-emption analysis."  MDL.Dkt.3750:35.  As this Court explained in *Guarino*, plaintiffs may not "attempt to elude" impossibility preemption "by clothing" the allegations supporting their state-law claims in terms of new theories of liability.  719 F.3d at 1249.  State law claims are preempted if, "at bottom," they rest on "allegations regarding" labeling or design defects that generic defendants could not have fixed while complying with the federal "duty of sameness."  *Id.*; *see also Bartlett*, 570 U.S. at 486–87.  That was the case here because Plaintiffs' core theory remained that, due to ranitidine's molecular design, no ranitidine product is safe to ingest.

Moreover, accepting Plaintiffs' invitation to judicially strike certain allegations within Plaintiffs' causes of action violates well-settled limits of *Erie* principles because, by striking duties essential to the claims, the Court would be inventing new state-law claims.  This it cannot do.  *See Salinero v. Johnson & Johnson*, 995 F.3d 959, 966–67 (11th Cir. 2021)

IV.    The district court faithfully applied this Court's precedents establishing that federal law impliedly preempts private efforts to enforce the FDCA, foreclosing Plaintiffs' failure-to-warn-through-FDA claims.  MDL.Dkt.3715:41–49; *see Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1329–30 (11th Cir. 2017); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348–53 (2001).  The district court's decision is also supported by *Mensing*, in which the Supreme Court held that the possibility of contacting FDA for assistance in warning cannot defeat generic-drug preemption of warnings-based causes of action.  *See Mensing*, 564 U.S. at 611.

## ARGUMENT

## I.    The District Court Had Subject-Matter Jurisdiction

Throughout this litigation, the parties and the district court worked together to craft a procedure that would resolve "common questions" while preserving the identities of the individual actions in this MDL.  The filing of multi-plaintiff complaints was prohibited, and the "operative complaint" in each case would be a combination of the relevant master complaint and the individual plaintiff's SFC.  Leave of court was required to file an amended SFC if "the effect of the amendment would be to destroy diversity" in any individual case.  MDL.Dkt.876:5; *see generally Chandler*, CA11.Dkt.264:3–7.

Plaintiffs know this, and previously told this Court that "MDL Consolidation Did Not Convert Thousands of Individual Cases into a Single Action" for *any*

purpose including diversity jurisdiction. *Cartee*, CA11.Dkt.23:10,14. The contrary view, Plaintiffs urged, was not just wrong, it is "absurd," "makes no sense," rests on a "twisted interpretation" of the law, would "make a mockery of pleading rules and Article III," and is "foreclosed" by and "impossible to square" with "controlling" Supreme Court precedent. *Cartee*, CA11.Dkt.23:1,10,14; *Cartee*, CA11.Dkt.265:7.

That was in March 2021. Since then, Plaintiffs have suffered a string of back-to-back losses in this Court and the district court. The net result is that judgment has been entered against every plaintiff in the Zantac MDL. And in a great many of those cases the judgment in favor of Generic Defendants rests on multiple independent bases, including one—the district court's ruling on *Daubert* and general causation—that is reviewable only for abuse of discretion.

With no case left, on April 10, 2024, Plaintiffs filed their opening briefs in the latest round of MDL appeals. Plaintiffs now say that they have no choice but to "reluctantly concede that the cases were merged" for *all* purposes, pointing chiefly to this Court's ruling in *Cartee*. I.B. at 20.

Plaintiffs' argument makes no sense. *Cartee* expressly and unambiguously repudiated the premise of the merger theory. As this Court explained, "[t]he MPIC name[s] no individual plaintiffs," "states it 'is not intended to consolidate for any purpose the separate claims of the individual Plaintiffs in this MDL,'" and "refers to the plaintiffs' cases as individual 'actions' throughout." *Cartee*, 2022 WL

23

16729151, at *2 (citing MDL.Dkt.887¶¶216,434–35).   Thus, the *Cartee* Court concluded, Cartee's action remained "alive and pending" and would so remain until a final ruling as to both the MPIC and his SFC put "the last nail in the coffin of his action."

Plaintiffs' post-*Cartee* litigation conduct—in this Court and the district court—does not support the conclusion that *Cartee* changed the legal landscape. *Cartee* was decided on November 7, 2022.   For the next 17 months, Plaintiffs asserted that the district court had subject matter jurisdiction based on diversity. *Cartee*, CA11.Dkt.23; *Chandler*, CA11.Dkt.265.

Plaintiffs' volte-face is also inconsistent with the law on master pleadings in MDLs.   Courts have consistently held that a master complaint "may be treated as a substantive complaint replacing the individual complaints only where the [p]arties consent to such treatment."   *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1259 (M.D. Fla. 2019) (collecting cases); *Bell v. Publix Super Markets Inc.*, 982 F.3d 468, 490 (7th Cir. 2020). The district court recognized this principle when entering judgment in these Generic-Only cases. MDL.Dkt.4595:21.

Here, the parties and district court never intended or consented to merge all Plaintiffs' individual cases into a single, monolithic action.   The MDL did not use a master complaint that "superseded the individual pleadings," *Bell*, 982 F.3d at 491,

but rather followed the common practice of using a master complaint and SFCs, which collectively formed the operative complaint. *See* MDL.Dkt.1496¶5. Plaintiffs stated explicitly in the MPIC that they did not consent to merge their individual cases and that there was complete diversity in each plaintiff's individual action. MDL.Dkt.887:2¶216. The district court's pretrial orders likewise treated each Plaintiff as having a separate, individual action.  For example, the court issued a pretrial order permitting direct filing of cases into the MDL, with each plaintiff paying filing fees and receiving a unique case number. *See* MDL.Dkt.422:1.  And the MDL actions were never joined via Rule 20 or an amended complaint, which (as Plaintiffs previously acknowledged) means they necessarily remained separate actions. *Cartee*, CA11.Dkt.79:1–3.

Last, but not least, even if this Court concludes that Plaintiffs' cases were inadvertently merged into a single action, it can "retroactively restore subject matter jurisdiction" by de-merging the cases. *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 862–63 (11th Cir. 1998).  There is no reason why this Court should allow an accidental merger to erase years of work by the parties and the district court.[6]

This Court should reach the merits.

---

[6] Plaintiffs also raise arguments regarding statements of other sets of Defendants and the district court's conduct "after" it issued judgment in these eighteen cases.  These arguments are separately addressed in Generic Defendants' brief in the consolidated actions (which includes as part of its record the district court's conduct after November 2021).

## II.    The District Court Correctly Dismissed the MPIC's State-Law Claims Against Generic Defendants

### A.    The District Court Correctly Concluded that Federal Law Preempts Plaintiffs' Claims Against Generic Defendants in the MPIC

#### 1.    Preemption Background

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land, … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.  "In accordance with that principle, when state law conflicts with federal law, state law must give way."  *Guarino*, 719 F.3d at 1248.

As the district court recognized, *Mensing* and *Bartlett* supply the framework for determining when federal law conflicts with state-law claims against generic pharmaceutical companies.  *See, e.g.*, *Guarino*, 719 F.3d at 1248–49; *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1253 (11th Cir. 2022) (explaining that this Court's conflict preemption analysis is guided by "the Supreme Court's treatment of a similar preemption claim").

Like Plaintiffs here, the *Mensing* plaintiffs alleged that the label of a generic drug failed to warn of the drug's alleged risk.  564 U.S. at 610.  The Supreme Court recognized that the state-law duty would require manufacturers to alter their drug's label.  *Id*. at 611–12.  But the Court also recognized that federal law required generic drug manufacturers to create and maintain labeling identical to the brand-name drug.

26

*Id*. at 613.  Accordingly, if the generic drug manufacturers were required to alter labeling to comply with state law, they would be violating their federal duty of "sameness."  *Id.* at 613–15.  "When a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes."  *Id.* at 623–24.

In Justice Thomas's concurring opinion in *Mensing*, he reached the same result by reading the Supremacy Clause as "effectively repealing contrary state law."  *Mensing*, 564 U.S. at 621.  Justice Thomas concluded that the warnings claims were preempted because "courts should not strain to find ways to reconcile federal law with seemingly conflicting state law" and "the 'ordinary meaning' of federal law blocks [generic manufacturers] from independently accomplishing what state law requires."  *Id.* at 622–23 (plurality).

Just two years later, the Supreme Court extended *Mensing*, holding that federal law also preempts state-law design-defect claims against generic drug manufacturers because they cannot change formulation without FDA approval.  *Bartlett*, 570 U.S. 475–76; 77.  The *Bartlett* Court also squarely rejected what it referred to as a "stop-selling" argument: that a manufacturer could satisfy both its state- and federal-law duties by choosing not to make the FDA-approved medicine at all.  This is because impossibility preemption jurisprudence "presume[s] that an

actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id.*  Any other interpretation "would mean that not only [*Mensing*], but also the vast majority—if not all—of the cases in which the Court has found impossibility pre-emption, were wrongly decided." *Id.*

Since *Mensing* and *Bartlett*, circuit courts nationwide—including this Court—have dismissed state-law claims against generic drug manufacturers based on allegations that the generic manufacturer should have made changes to the labeling or the drug product itself.  For example, in *Guarino v. Wyeth, LLC*, 719 F.3d 1245 (11th Cir. 2013), this Court affirmed dismissal of claims for negligence, strict liability, breach of warranty, misrepresentation and fraud, and negligence *per se* asserted against a generic manufacturer.[7]  Dozens of district courts likewise have dismissed as preempted similar claims against generic manufacturers.  *See, e.g.*, *Tsavaris v. Pfizer, Inc.*, 154 F. Supp. 3d 1327 (S.D. Fla. 2016); *Allbright v. Teva*

---

[7] *See also Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355 (7th Cir. 2016); *Houston v. United States*, 638 F. App'x 508 (7th Cir. 2016); *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281 (6th Cir. 2015); *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig. (No. II)*, 751 F.3d 150 (3d Cir. 2014); *Eckhardt v. Qualitest Pharm., Inc.*, 751 F.3d 674 (5th Cir. 2014); *Lashley v. Pfizer, Inc.*, 750 F.3d 470 (5th Cir. 2014); *Johnson v. Teva Pharm. USA, Inc.*, 758 F.3d 605 (5th Cir. 2014); *Brinkley v. Pfizer, Inc.*, 772 F.3d 1133 (8th Cir. 2014); *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177 (5th Cir. 2012); *Drager v. PLIVA USA, Inc.*, 741 F.3d 470 (4th Cir. 2014); *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014).

28

*Pharm. USA, Inc.*, 290 F. Supp. 3d 1321 (S.D. Fla. 2017).

> 2.    *The District Court Properly Applied Mensing and Bartlett to Dismiss the Claims in the MPIC as Preempted*

The district court correctly concluded that Plaintiffs' state-law claims against generic manufacturers are preempted by the FDCA.  As pleaded in the MPIC, each of Plaintiffs' state-law claims turned on alleged inadequacies in the labeling and design of generic ranitidine. *See, e.g.*, MDL.Dkt.887¶¶456,485.   But Generic Defendants would have violated the federal duty of sameness if they had unilaterally changed their products' labeling or design. *Bartlett*, 570 U.S. at 486–87; *Mensing*, 564 U.S. at 613–15; 21 U.S.C. §§ 355(j)(2)(i), (ii), and (v).

All that leaves is the argument that it was theoretically "possible" for the Generic Defendants to comply with state and federal law by exiting the market altogether.  But *Bartlett's* holding that a Generic Manufacturer seeking to satisfy federal and state law obligations "is not required to cease acting altogether in order to avoid liability" forecloses that argument.  *See* 570 U.S. at 488.

In sum, Generic Defendants could not "independently do under federal law what state law require[d] of" them. *See Mensing*, 540 U.S. at 620; *Bartlett*, 570 U.S. at 475.  The district court correctly concluded that Plaintiffs' claims against Generic Defendants are preempted by federal law.  MDL.Dkt.2512:27–29.

### 3. *Plaintiffs' Misbranding Argument Cannot Evade Preemption*

Plaintiffs argue that conflict preemption does not apply because, federal misbranding law "required Defendants to stop selling ranitidine" I.B. at 2, 18, 33; 21 U.S.C. §§ 331(a)–(d).  They claim that their "pleadings make plain as day that ranitidine is 'dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof,'" and "[t]hat makes selling it illegal under federal law."  I.B. at 35 (quoting 21 U.S.C. § 352(j)).  Plaintiffs also assert that state-law duties "required" Generic Defendants "*not to sell the drug at all*."  I.B. at 2, 34, 40 (emphasis in original).  Thus, Plaintiffs conclude, the pertinent "federal and state law duties here are parallel" and "do not conflict" I.B. at 18, 33 (alterations omitted).

Plaintiffs' argument fails because not a single state-law claim in the MPIC asserts that state law ***required*** Generic Defendants to stop selling ranitidine.  Rather, Plaintiffs allege liability for a failure to provide warnings, failure to change ranitidine's basic design or both.  *See supra* Statement of the Facts, III.B, III.D.  Because there is nothing in their actual state-law claims that would parallel the purported federal misbranding duty to stop selling, the entire misbranding argument is without merit, and certainly cannot avoid straightforward preemption under *Mensing* and *Bartlett*.

Moreover, even if Plaintiffs had pleaded a state-law duty to stop selling (which they have not) there is no legal distinction between the "option" to stop selling and a "requirement" to stop selling. *Cf.* I.B. at 39–40. Indeed, the Supreme Court used both terms interchangeably in *Bartlett*. *See* 570 U.S. at 488. And Plaintiffs affirmatively state that their MPIC design-defect claims should be assessed under the standard set in Restatement (Second) of Torts § 402A (Am. Law. Inst. 1965). This is the exact same standard that governed the claims at issue in *Bartlett*, *see* 570 U.S. at 504, yet the Supreme Court still found preemption. Even Plaintiffs use the terms "duty" or "requirement" as interchangeable with "option." *See* I.B. at 37 (asserting that state law would "***allow*** . . . withdrawing a drug from a market" and equating such allowance with a state-law "duty"). Thus, the argument is simply not a viable basis to distinguish this case from *Bartlett*.

### 4.    The Supreme Court Has Rejected Plaintiffs' "Misbranding" Argument

Plaintiffs' misbranding argument also is squarely foreclosed by *Mensing*. There, the plaintiffs "pleaded that the Manufacturers knew or should have known of the high risk of tardive dyskinesia inherent in the long-term use of their product," and "also pleaded that the Manufacturers knew or should have known that their labels did not adequately warn of that risk." *Mensing*, 564 U.S. at 611. Like here, the plaintiffs argued that the state and federal duties were parallel because the federal misbranding statute prohibited the sale of misbranded drugs. *See, e.g.*, *PLIVA Inc.*

31

*v. Mensing*, Case Nos. 09-993, 09-1039, and 09-1501, at 30 (U.S. Mar. 2011) (Brief for the United States as *amicus curiae*) ("In addition to whatever claim [plaintiffs'] allegations state under state law, they would also establish that [the generic manufacturer's] products were misbranded under 21 U.S.C. § 352(f)(2) because those drugs would lack adequate warnings."), 13 ("The question for preemption purposes … is whether the generic drugs respondents took were misbranded under 21 U.S.C. § 352(f)(2) and the standard in 21 C.F.R. § 201.57(e).").

It made sense for plaintiffs in *Mensing* to raise the parallel misbranding argument in the Supreme Court.  After all, the court of appeals had relied on that argument in holding that plaintiffs' claims were not preempted by federal law.  *See Mensing v. Wyeth, Inc.*, 588 F.3d 603, 606, 611 n.6 (8th Cir. 2009) (explaining that "[m]anufacturers cannot distribute a 'misbranded' drug, 21 U.S.C. §§ 331(a)–(b), including a drug whose 'labeling is false or misleading in any particular'"), *rev'd sub nom. PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011).

The Supreme Court nonetheless rejected this "parallel-duty" claim, holding that the state-law claims were preempted because "it was impossible for the [Generic] Manufacturers to comply with both their state-law duty to change the label and their federal-law duty to keep the label the same."  *Id.* at 618.  Ultimately, the Supreme Court found it unnecessary to resolve whether the manufacturers were obligated to seek a change in their labeling under the federal "misbranding" law

because it found "pre-emption e*ven assuming such a duty existed*."  *Id.* at 617 (emphasis added).

If that were not enough, plaintiffs in *Mensing* filed a petition for rehearing that once again argued "the actual state law duties paralleled federal law and could have been satisfied by Petitioners independently[.]"  *PLIVA, Inc. v. Mensing*, Nos. 09-993, 09-1039, 09-1501, 2011 WL 2874547, at *3–4 (U.S. July 18, 2011) (respondents' petition for rehearing).  This is precisely the argument Plaintiffs make here.  *Id.* at *3; *compare* I.B. at 18, 33–38.  The Supreme Court denied the petition. *PLIVA, Inc. v. Mensing*, 564 U.S. 1058 (mem.) (2011) (denying rehearing petition). As the district court later noted, the "problem with the Plaintiffs' argument [was that] their precise argument had already been presented to the Supreme Court, which rejected the argument not once, but twice."  MDL.Dkt.3715:21.

Like federal courts across the country, the district court correctly concluded that Plaintiffs' parallel misbranding theory, if accepted, "would render the vast body of pre-emption caselaw in the [generic] drug context, including binding Supreme Court decisions, meaningless."  MDL.Dkt.2512:28; *see, e.g., Gardley-Starks v. Pfizer, Inc.,* 917 F. Supp. 2d 597, 607 (N.D. Miss. 2013); *Moretti v. PLIVA, Inc*., No. 2:08-CV-00396, 2012 WL 628502, at *2, 5 (D. Nev. Feb. 27, 2012), *aff'd sub nom. Moretti v. Wyeth, Inc*., 579 F. App'x 563 (9th Cir. 2014); *Moretti v. Mutual Pharm. Co*., 852 F Supp. 2d 1114, 1118 (D. Minn. 2012), *aff'd*, 518 F. App'x 486 (8th Cir.

33

2013); *Metz v. Wyeth, LLC*, No. 8:10-CV-2658, 2011 WL 5024448, at *4 (M.D. Fla. Oct. 20, 2011).

In sum, *Mensing* and *Bartlett* hold that, for purposes of impossibility preemption analysis, the pertinent federal-law duty for generic drug manufacturers is the "duty of sameness"—which preempts state-law claims premised on changing drug warning or design. *Mensing* rejected Plaintiffs' argument that the *separate* federal duty to avoid making or selling "misbranded" drugs should control the preemption analysis. The Supreme Court's rejection of the misbranding theory is dispositive. *Porter v. White*, 483 F.3d 1294, 1306 (11th Cir. 2007) (rejecting reasoning that is inconsistent with Supreme Court precedent).[8] Plaintiffs' claims are preempted, and the district court's decision should be affirmed.

**B. Plaintiffs' Attempts to Distinguish *Mensing* and *Bartlett* are Unavailing**

*1. The FDA's Actions in 2019 and 2020 Are Irrelevant to Preemption*

Without explanation, Plaintiffs suggest that the "misbranding" provisions of federal law somehow nullify preemption here because the "FDA ordered a recall" I.B. at 36; *see id.* at 18. Preemption analysis does not turn on whether a product was

---

[8] For similar reasons, the district court's reasoning is also consistent with Justice Thomas's concurring analysis in *Mensing*. The federal "duty of sameness" conflicts with and thus impliedly repeals the MPIC state-law claims that impose a contrary duty to change warnings or change design.

recalled, but regardless, Plaintiffs' argument fails because the FDA did not order a recall and never determined that ranitidine was "misbranded." *See supra*, Statement of Facts, sec. II.

The voluntary market withdrawal does not establish that "federal law made selling ranitidine illegal." I.B. at 18. Plaintiffs' entire argument on this point is based on the misbranding provision of the FDCA. I.B. at 33–34. But that provision does not say that a drug is "misbranded" if the FDA informally requests a voluntary market withdrawal. *See* 21 U.S.C. § 351 (listing 32 bases on which "[a] drug … shall be deemed to be misbranded"). And Plaintiffs themselves conceded at the district court that "a voluntary recall [sic] by itself is not proof of misbranding." MDL.Dkt.2499:137.

The FDA's request for a voluntary market withdrawal did not rescind its approval of generic ranitidine, either. *See* I.B. at 39 (arguing that *Bartlett* is distinguishable because it "involved an FDA-approved medication, sulindac, that remained FDA-approved at the time of plaintiff's lawsuit"). The FDCA provides that the Secretary shall withdraw approval of a drug application if, among other things, the drug is "unsafe for use under the conditions of use upon the basis of which the application was approved." 21 U.S.C. § 355(e). To exercise that authority, however, the Secretary must follow statutorily mandated procedures. *Id.* Where the Secretary finds "there is an imminent hazard to the public health, he may suspend

the approval of such application immediately, and give the applicant notice of his action and afford the applicant the opportunity for an expedited hearing under this subsection." *Id.* Otherwise, the applicant must be given "due notice and opportunity for hearing" before withdrawal. *Id*. Neither happened here. And as Plaintiffs conceded below, the FDA "didn't technically go through the mandatory recall provision, and they didn't make a misbranding finding, and we never stated anything to the contrary." MDL.Dkt.2499:137.

In any event, a violation of the misbranding statute may only be enforced by the FDA. *See* 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter [including §§ 351–52] shall be by and in the name of the United States") (emphasis added). In *Buckman*, the Supreme Court made clear that the FDCA is "enforced exclusively by the Federal Government." 531 U.S. at 352 (citing 21 U.S.C. § 337(a)); *see also Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272, 1284 n.10 (11th Cir. 2002) ("[N]o private right of action exists for a violation of the FDCA."). Although certain state-law causes of action may "parallel federal safety requirements," it cannot be said that "any violation of the FDCA will support a state-law claim." *Buckman*, 531 U.S. at 352–53.

36

Since *Buckman*, courts routinely hold that misbranding is an FDA determination, not one that a private citizen can make or enforce.[9] The district court did so here in its preemption order as to the Retailer and Distributor Defendants, which it referenced and relied on in its ruling as to the Generic Defendants:

> "[T]here is no private right of action to enforce federal misbranding law—a statute that imposes criminal penalties . . . . The Plaintiffs cannot create a private right of action to enforce federal misbranding rules by disguising it as a state-law strict-liability claim . . . . State tort claims that rely solely upon federal law for the source of a duty are pre-empted."

MDL.Dkt.2513:31–32; *see also* MDL.Dkt.2512:41,47.    Thus, the federal misbranding provisions cannot be the basis for avoiding preemption—especially where, as here, Generic Defendants were prohibited from altering ranitidine's label or composition in a manner that would allow them to avoid liability.

Lastly, even assuming *arguendo* that the FDA's request for a voluntary withdrawal somehow changed the legal status quo and "made selling ranitidine illegal" under federal law *after* the FDA made that request, the FDA's request did

---

[9] *See United States v. Navarro*, 551 F. Supp. 3d 380, 404 (S.D.N.Y. 2021) (holding that "misbranding . . . is a uniquely federal issue, clearly within the regulatory jurisdiction of the FDA"); *Pediamed Pharms., Inc. v. Breckenridge Pharm., Inc.*, 419 F. Supp. 2d 715, 727 (D. Md. 2006) (holding that an argument which "requires direct application of the FDCA, which only the FDA is entitled to enforce" is precluded); *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 838 (W.D. Tex. 2001) (holding that claims involving "facts and arguments to be determined in a misbranding enforcement action, matters within the sole jurisdiction of the FDA" is precluded).

not *retroactively* make it illegal for Generic Manufacturers to have made or sold ranitidine *before* FDA's request.  Just the opposite.  To the extent that the FDA's position is relevant in assessing Generic Manufacturers' legal duties under federal law, FDA's "request" for a "voluntary" market withdrawal confirms that it was *not* illegal for Generic Manufacturers to make and sell ranitidine.  Of course, Plaintiffs do not and cannot allege that any Generic Defendants sold ranitidine-containing products *after* the FDA requested a voluntary market withdrawal.

For all of these reasons, Plaintiffs' assertion that "this case … involv[es] a recalled drug" (I.B. at 18) is a red herring—and does not make *Mensing* or *Bartlett* distinguishable.

## 2.    *Bartlett's Footnotes Do Not Save Plaintiffs' Claims*

Ignoring the holdings of *Mensing* and *Bartlett*, Plaintiffs seek to retroactively recharacterize their claims to fit into a new (and textually implausible) "misbranding" theory never endorsed by this Court or the Supreme Court and which *Bartlett* declined to address in two footnotes.  I.B. at 39–40.  Plaintiffs' heavy reliance on those two footnotes is unavailing.

Plaintiffs argue that footnote 4 in *Bartlett* created an exception to preemption whenever a party alleges that a drug was misbranded.  I.B. at 28.  That footnote states, in relevant part:

> We do not address state design-defect claims that parallel
> the federal misbranding statute.  The misbranding statute

> requires a manufacturer to pull even an FDA-approved
> drug from the market when it is "dangerous to health"
> even if "used in the dosage or manner, or with the
> frequency or duration prescribed, recommended, or
> suggested in the labeling thereof."

570 U.S. at 487, n.4. This footnote does not defeat preemption.

The genesis of *Bartlett* footnote 4 is an argument in the Solicitor General's *amicus curiae* brief filed on behalf of the FDA. The FDA acknowledged that plaintiffs' design defect claim in *Bartlett* necessarily turned on the adequacy of the labeling for the drug and the generic manufacturers could not make unilateral changes to the labeling. Thus, the claim in *Bartlett* was preempted under *Mensing* even considering federal misbranding law. *Mut. Pharm. Co., Inc. v. Bartlett*, No. 12-142, 2013 WL 314460, at *19–20 (U.S. Jan. 22, 2013) (brief for the United States as *amicus curiae*). The FDA went on, however, to flag an issue *that was not before the Court, i.e.,* whether "a 'pure' design defect claim *that does not consider the adequacy of the labeling*" would be preempted. *Id.* at *20–21 (emphasis added). The FDA acknowledged that the Supreme Court in *Bartlett* need not decide the issue because the design defect claim in that case *did* focus on the product's labeling. *Id.* at *21; *see also id.* at *20.

In footnote 4, the Supreme Court merely agreed that preemption of a "pure" design defect claim was not before it. *Bartlett,* 570 U.S. at 487, n.4. As the district court here recognized, it "certainly did not overrule or modify *Mensing*."

MDL.Dkt.3715:26. And every court that has considered footnote 4 agrees that it created no exception to preemption. *In re Darvocet,* 756 F.3d at 928–30 ("[I]t is not clear whether this language implies that an exception for 'parallel misbranding' claims actually exists."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Prac. & Prods. Liab. Litig.,* No 3:09-md-02100, 2015 WL 7272766, at *3–4 (S.D. Ill. Nov. 18, 2015) (same).

Moreover, even the hypothetical exception would not apply to Plaintiffs' claims here because it applies only to "pure" design defect claims, *i.e.* claims that are *not* based on labeling. *In re Darvocet,* 756 F.3d at 930 (noting that the FDA argued that its comments would apply only to "pure" design defect claims); *In re Yasmin & Yaz,* 2015 WL 7272766 at *4 ("Assuming *Bartlett* allows an exception for parallel misbranding claims, the exception only applies to 'pure' design defect claims, *i.e.* design defect claims that do *not* turn on the adequacy of drug labeling.") (emphasis in original).

Plaintiffs here conceded that their design defect theory turns *entirely* on the adequacy of ranitidine's warnings, emphasizing that "a failure to include an adequate warning is every bit as much a design defect as a failure to design a safe formulation." MDL.Dkt.1976:11,14,16. And they conceded that "there is no such thing as a 'pure'…design-defect claim" under any state's law. MDL.Dkt.1976:14. Plaintiffs argue their MPIC design defect claims should be assessed under comment

k to the Restatement (Second) of Torts § 402A. *See* I.B. at 36–37. But comment k says that a product is not unreasonably dangerous when it "is accompanied by proper directions and warning." Thus, *Bartlett* footnote 4 does not apply to Plaintiffs' design defect claims.

Plaintiffs' reliance on Footnote 3 is equally misplaced. Plaintiffs did not raise Footnote 3 in the district court, so this Court need not consider the argument. *See Bryan v. CEO DeKalb Co. v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009) ("[A]bsent extraordinary circumstances, legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal"). Regardless, Footnote 3 likewise did not endorse a sweeping exception to preemption and has not been relied on by any court to save cases from dismissal under *Mensing* and *Bartlett*. Although the footnote referenced in an aside "the rare case in which state or federal law actually requires a product to be pulled from the market," the Supreme Court did not have before it or define what that "rare case" would be and did not say that such a rare case would necessarily evade preemption. Here, as described below, the FDA has not made any finding of misbranding. Moreover, footnote 3 emphasizes that a manufacturer's ability to stop selling a product cannot defeat preemption and reiterates *Mensing's* admonishment that "[t]o hold otherwise would render impossibility pre-emption 'all but meaningless.'" *Bartlett*, 570 U.S. at 487 n.3.

This case is plainly not the "rare" case the footnote contemplated. State law did not require ranitidine products be withdrawn; as noted, (a) Plaintiffs' design defect theory is the same as *Bartlett*, which required a change in formulation or warning, and was held preempted; and (b) Plaintiffs did not plead in any of their MPIC claims that state law required ranitidine to be pulled from the market. And Plaintiffs, as private parties in civil litigation, cannot enforce the provisions of federal misbranding law, *see* 21 U.S.C. § 337(a); *Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272, 1284 n.10 (11th Cir. 2002) ("[N]o private right of action exists for a violation of the FDCA."). I.B. at 43. *Bartlett's* footnotes do not save Plaintiffs' claims.

### 3. *Plaintiffs' Attempt to Impose a New Analytical Framework for Implied Preemption Must Be Rejected*

Dissatisfied with the current state of the law—including the Hatch-Waxman amendments to the FDCA and caselaw from the Supreme Court and this Court discussed above—Plaintiffs look to "[t]he basic logic of conflict preemption" (I.B. at 28–31) and caselaw involving express preemption to advocate for a new analytical framework for preemption (I.B. at 31, 41–42).

But as to conflict preemption, this Court does not write on a blank slate. The "basic logic of conflict preemption" derives from the Supremacy Clause, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992), and the Supreme Court has been interpreting that clause for centuries. *Mensing* and *Bartlett* supply the controlling analytical framework for assessing whether impossibility preemption

42

bars state-law claims against generic drug manufacturers. *E.g.*, *Guarino*, 719 F.3d at 1249.

Moreover, as caselaw from the Supreme Court and this Court make clear, conflict preemption calls for context-specific analysis. *E.g.*, *Mensing*, 564 U.S. at 625–26 ("different federal statutes and regulations may, as here, lead to different preemption results"). Thus, it is unhelpful and inappropriate to assess a claim of implied preemption involving generic drug makers under the FDCA by relying on caselaw addressing a claim of express preemption against a non-drug manufacturer regulated by a different statute. *See* MDL.Dkt.3750.

This Court confirmed as much in its recent decision in *Carson v. Monsanto Co.*, 92 F.4th 980 (11th Cir. 2024). The Court relied on a parallel between federal misbranding provisions for a pesticide manufacturer and Georgia state-law to hold that the plaintiff's claims were not preempted by an express preemption provision. *Id.* at 991. But the Court cited *Mensing's* admonition that "different federal statutes and regulations may . . . lead to different preemption results," *see Carson*, 92 F.4th at 995, and noted that the conflict between the federal duty of sameness and state-law claims "transcended the mere 'possibility of impossibility'" and "required . . . find[ing] implied preemption." *Id.* at 998 (quoting *Mensing*, 564 U.S. at 625 n.8).

To that end, Plaintiffs' reliance on *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 447 (2005) and other cases in the medical device context to argue for a "parallel

misbranding" exception to implied impossibility preemption is inappropriate.  I.B. at 28–31.  *Bates* dealt with a different federal statute and distinguishable *express* preemption regime under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").  The analysis in *Bates, Carson,* and similar cases involving express preemption is simply inapplicable here.  *E.g.*, *In re Darvocet,* 756 F.3d at 935; *Strayhorn v. Wyeth Pharm. Inc.,* 737 F.3d 378, 398 (6th Cir 2013).

## III.   The District Court Correctly Concluded that Federal Law Preempts the State-Law Claims Against Generic Defendants in the AMPIC

### A.   The District Court Properly Rejected Plaintiffs' Argument that "Sub-Duties" Should Control the Preemption Analysis

Plaintiffs argued that their failure to warn and negligence claims in the AMPIC were not preempted by federal law because, even though such claims require Generic Defendants to do things they could not independently do under federal law, those general duties had "sub-duties" within them.  MDL.Dkt.3750:31. For example, Plaintiffs argue that the duty to warn includes within it the sub-duty to warn through an accurate expiration date. MDL.Dkt.3750:31. Plaintiffs also argue that the duty to design a reasonably safe product includes, within it, the sub-duty to properly package, store, test, and transport ranitidine. MDL.Dkt.3750:32.

The district court properly rejected Plaintiffs' attempts to create fact-specific, custom-made causes of action.  MDL.Dkt.3750:33–35.  Determining a defendant's precise duty is key to the preemption analysis, and despite being provided the

opportunity to provide authority for their argument, Plaintiffs provided nothing that would support the position that the relevant duties should be anything other than the recognized duty to use reasonable care or duty to warn. MDL.Dkt.3750:34–35. To the contrary, the district court noted, "there is no such tort as 'Negligent Choosing and Making of Containers' or 'Negligent Transporting and Storing of Products.'" MDL.Dkt.3750:33. Instead, the alleged failures to reasonably package or transport a product are "merely fact patterns that would permit a plaintiff to bring the tort of ordinary negligence." MDL.Dkt.3750:33. Plaintiffs' sub-duties, then, were theories of breach, not independent duties supporting some new cause of action that could avoid preemption. The district court properly concluded that "sub-duties" were not "cognizable (and divisible) legal duties, let alone the duties to be used for comparison in federal pre-emption analysis." MDL.Dkt.3750:35.

Indeed, as this Court explained in *Guarino*, plaintiffs may not "attempt to elude" the Supreme Court's conflict preemption precedents "by clothing" the allegations supporting their state-law claims in terms of new theories of liability. 719 F.3d at 1249. State law claims are preempted if, "at bottom," they rest on "allegations regarding" labeling or design defects that generic defendants could not have fixed while complying with the federal "duty of sameness." *Id.*; *see Bartlett*, 570 U.S. at 486–87. That is the case here. As the district court explained:

> Plaintiffs have pled claims rooted in a broad theory of design defect. Contrary to the Plaintiffs' characterization

of their pleadings, they have not brought narrow, independent claims against the Generic Manufacturer Defendants. **Their claims are tantamount to design defect claims, and design defect claims against generic drug manufacturers are preempted**.

MDL.Dkt.3750:40 (emphasis added; internal citations omitted).  And again:

Although the Plaintiffs replead their claims after the Court's dismissal, **the core of their pleadings remains virtually identical to the pleadings that the Court dismissed**. The plaintiffs still allege that ranitidine is a defectively designed molecule; it is highly unstable and apt to form a potent carcinogen. The Plaintiffs still allege that ranitidine is dangerous at all points in time from the moment it is manufactured; it is harmful when consumed as directed (particularly when accompanied by nitrites in the stomach) and when stored at room temperature in accordance with its labeling, etc.

MDL.Dkt.3750:40 (emphasis added).  The district court thus correctly concluded that the specific claims at issue are preempted by the FDCA and its implementing regulations.

## B.    Plaintiffs Misconstrue the Applicable Preemption Case Law

Plaintiffs' primary argument also misconstrues the Supreme Court's statement in *English v. General Electric Co.*, 496 U.S. 72, 79 (1990), and other cases that "state law is pre-empted to the extent that it actually conflicts with federal law." Plaintiffs misread that statement as requiring courts to surgically remove problematic allegations from a complaint to create a cause of action with whatever is left.  In so doing, they ignore that the *Bartlett* Court reached the *opposite*

conclusion—in the generic-drug context—when applying the language from *English*:

> [S]tate-law design-defect claims like New Hampshire's that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling. . . . [F]ederal law establishes no safe-harbor for drug companies—but it does prevent them from taking certain remedial measures. Where state law imposes a duty to take such remedial measures, it "actual[ly] conflict[s] with federal law" by making it "'impossible for a private party to comply with both state and federal requirements.'"

*Bartlett*, 570 U.S. at 490 (quoting, *inter alia*, *English*, 496 U.S. at 78–79). The *Bartlett* Court held that impossibility preemption analysis requires looking at *all* the duties and requirements of the purported state-law "claims." *Id.* at 492. Applying that standard, the *Bartlett* Court examined the duties and requirements of the state-law claim, *id.* at 480–86, and ultimately held that "[b]ecause it was impossible for [the defendant] . . . to comply with both state and federal law, New Hampshire's warning-based design-defect **cause of action** is pre-empted." *Id.* at 486–87 (emphasis added). There was no "partial" preemption.

The Supreme Court did the same in *Mensing*. *See* 564 U.S. at 624 ("Here, state law imposed a duty on the Manufacturers to take a certain action, and federal law barred them from taking that action. . . . Mensing and Demahy's **tort claims are pre-empted**.") (emphasis added). Plaintiffs also ignore the opening line of *English*,

which presents the issue as "whether federal law pre-empts a state-law **cause of action** for intentional infliction of emotional distress." *English*, 496 U.S. at 74 (emphasis added).

No case that Plaintiffs cite is to the contrary. None of these cases apply conflict preemption to claims against pharmaceutical manufacturers, and some are not even conflict preemption cases.[10] *See* I.B. at 44 n.13. None hold that a court evaluating conflict preemption (or any other form of preemption) should strike certain elements from a state cause of action to allow a plaintiff to state a claim based on what remains. In contrast, the Supreme Court has held, in cases outside the drug context, that a state cause of action that conflicts with federal law is preempted in its entirety. *See. e.g., Hillman v. Maretta*, 569 U.S. 483 (2013) (federal law for distributing insurance proceeds preempts statute establishing conflicting Virginia private cause of action).

This Court's decision in *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004), also does not help Plaintiffs. The *Cliff* Court examined a consumer-protection claim under Florida's Consumer Collection Practices Act ("FCCPA"). FCCPA Section 559.77(b) gives debtors a private right of action against "[a]ny person who fails to comply with **any provision** of [Florida Statute]

---

[10] *See e.g., Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 614 (1991); *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 291 (1987).

§ 559.72," which lists a host of prohibited collection practices. § 559.77(b), Fla. Stat. (2020) (emphasis added). In *Cliff*, the debtor brought a cause of action to enforce subsection 559.72(9). The court granted summary judgment on the claim as preempted by the federal Higher Education Act ("HEA") and the Eleventh Circuit reversed. 363 F.3d at 1121–31.

The *Cliff* holding is entirely consistent with Generic Defendants' preemption argument. The Eleventh Circuit explained that the FCCPA claim was not preempted because the plaintiff's state-law cause of action based on subsection 559.72(9) did not conflict with federal law.[11] But in *Cliff,* the claim was not preempted because the debt collector ***could fully*** comply with state law without violating federal law. In contrast, the Generic Defendants ***cannot fully*** comply with the purported state-law requirements because they cannot change the design or labeling of ranitidine. *Cliff* therefore lends no support to Plaintiffs' argument that a court sitting in diversity can alter the requirements of a state-law cause of action and create a new tort claim that avoids a conflict with federal law. *Cliff* reinforces that such conflicts require courts to dismiss the *entire* cause of action as preempted.

---

[11] The Eleventh Circuit found that "[a] claim under [Section] 559.72(9) requires the misrepresentation of a 'legal right' or an attempt to collect a debt that is 'not legitimate.'" *Cliff,* 363 F.3d. at 1126. In Cliff's case, after his default on student loan debt, a debt collection agency allegedly told Cliff he had no right to a pre-garnishment hearing, a right which *did* exist under HEA. *Id.* at 1124. The court held the FCCPA claim was not preempted because "a third-party debt collector . . . can comply with the HEA and [subsection] 559.72(9) simultaneously." *Id.* at 1126.

49

Contrary to Plaintiffs' contention, the Supreme Court has never supported the use of "sub-duties" to avoid implied preemption. In *Boyle v. United Technologies Corporation*, the Supreme Court employed the traditional preemption analysis. It first identified the defendant's federal contractual duties. 489 U.S. 500, 509 (1988). The Court then was able to determine the scope of the preempted state duties, *i.e.* those that conflict with the federal duties. *Id.* at 510–12. This is exactly what the district court did here. The district court identified the scope of the federal government's interest to identify whether Plaintiffs' claims were preempted. Nothing required the district court to parse out the different sub-duties as Plaintiffs now wish.

In sum, the district court was right to determine that Plaintiffs' claims all fail because they would require actions Generic Defendants could not independently take without violating federal law.

### C.    "Pruning" Plaintiffs' Claims Violates Basic *Erie* Principles

Accepting Plaintiffs' invitation to blue-pencil the preempted allegations in Plaintiffs' causes of action also violates *Erie* principles because, by striking duties essential to the claims, the Court would be inventing new state-law claims. This it cannot do. *See Salinero v. Johnson & Johnson*, 995 F.3d 959, 966–67 (11th Cir. 2021) (recognizing a "financial bias" exception to the learned intermediary doctrine "would amount to a sea change in the state's product liability law . . . . Without some

50

indication that Florida intends to recognize so significant a change in the law, a federal court sitting in diversity ought not to do so."); *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1251 (11th Cir. 2013); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011).[12]

As noted, the AMPIC itself does not limit the claims to only the alleged duty (or portion of the duty) that could be satisfied without violating federal law, even though the district court had previously instructed that "[u]pon any repleading, Plaintiffs should consider, as to each cause of action, the elements under each state's law and what state law would require of Defendants to avoid liability" and omit them.  MDL.Dkt.2512:29,37.  They did not do so.  But even if they had so limited their claims, Plaintiffs have provided no authority that any state would recognize, for example, a failure-to-warn-through-expiration-date claim divorced from the actual state-law duty to give adequate warnings to the consumer of the risk of injury, or a negligent-product-containers claim divorced from the duty of ordinary care in negligence.  Thus, Plaintiffs' request to convert their claims into materially different claims also fails under *Erie*.

---

[12] Further, once "pruned," the expiration date, storage and transport, product containers, and testing claims would merely seek to enforce federal regulations regarding stability testing, expiration dates, and warehousing, and as such are *Buckman*-preempted.    *See*   MDL.Dkt.2759¶¶446–50,940–41,1155–56,1742–43; *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 355 n.4 (2001).

### D.     Plaintiffs' Arguments are Belied by their Pleadings

Plaintiffs' arguments that the Generic Defendants could comply with state law without taking preempted actions are also belied by the actual allegations in the AMPIC.

### 1.     Expiration Dates

Plaintiffs' expiration date claims *openly* demand a preempted cancer warning. *See, e.g.,* MDL.Dkt.2759¶¶944,946,1162,1746,1748 ("Generic Manufacturer Defendants . . . had a duty to warn of the risks associated with the use of ranitidine."); MDL.Dkt.2759¶¶947,1164,1749 ("Generic Manufacturer Defendants had a duty to provide proper warnings to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks.").  Indeed, at a hearing on December 15, 2020, Plaintiffs conceded that "the law of no state would be fully satisfied by just shortening the expiration dates."   MDL.Dkt.2499:42. Instead, Generic Defendants would need to provide an "adequate" warning of the specific risks "associated with the use of ranitidine" past its expiration date, which Plaintiffs allege included the risk of NDMA forming and causing cancer. MDL.Dkt.2759¶462.   Because Generic Manufacturers could not issue such a warning under federal law, the expiry claims are preempted.

### 2.     Negligent Storage and Transportation

Plaintiffs omit the allegation most significant to preemption from their summary of the AMPIC's storage and transportation claim: The count rests on a

common-law-negligence duty "to exercise reasonable care in the storage and transportation of ranitidine API and ranitidine-containing products *to ensure the products were not unreasonably dangerous* to consumers and users." MDL.Dkt.2759¶2453 (emphasis added). Plaintiffs fail to explain how Generic Defendants could have acted independently to meet that duty. Plaintiffs do not contend that any changes to storage and transport practices for ranitidine API or finished product would prevent it from degrading to form NDMA over time or when ingested.[13] Instead, *avoiding* liability under this count would require Generic Defendants to either issue a cancer warning, change ranitidine's chemical design, or stop selling it—all preempted acts.

### 3.    *Negligent Product Containers*

In their AMPIC, Plaintiffs assert that the negligence law of all 50 states, the District of Columbia, and Puerto Rico have an identical duty for "a pharmaceutical manufacturer . . . to exercise reasonable care in choosing and making the containers for its products." *See, e.g.,* MDL.Dkt.2759¶¶1999–2206. As noted and as recognized by the district court, Plaintiffs do not cite authority showing that *any* jurisdiction recognizes an independent cause of action in negligence framed in such narrow terms. MDL.Dkt.3750:34.

---

[13] In fact, Plaintiffs allege that ranitidine degrades under *normal* storage conditions. *See* MDL.Dkt.2759¶¶6,346,347,377–79,953.

Applying the *recognized* state common-law duty in negligence, this claim is preempted for the same reasons as Plaintiffs' storage-and-transportation claim. As Plaintiffs admit, their sole claim is that placing fewer pills in a bottle or packaging them in blister packs "would have *reduced* the amount of NDMA in the ranitidine Plaintiffs consumed." MDL.Dkt.3326:9 (emphasis added); *see also* MDL.Dkt.2759¶1995. But given their allegations that NDMA forms in the body when ranitidine is taken as directed and under normal storage conditions (and therefore always exposes consumers to risk of cancer with no warning), the container changes would not ensure a product that is reasonably safe for consumer use. Thus, this claim too is preempted and must be dismissed.

### 4.    *Failure to Test*

Plaintiffs assert that their failure-to-test claim (brought only under Kansas and Texas law) is based on testing alone, *i.e.,* that simply performing "[a]dequate testing," and nothing more, "would fully satisfy the duty to test." MDL.Dkt.3326:13. But the AMPIC's allegations show otherwise, describing Kansas and Texas law as containing a "duty to exercise reasonable care in the testing of ranitidine-containing products *to ensure the products were not unreasonably dangerous*." MDL.Dkt.2759¶¶1973,1979 (emphasis added). Thus, the duty alleged is not just to better *test* ranitidine but also to *act* based on that testing to ensure consumers receive a safe product free of NDMA.

Here, even if testing had been performed and had disclosed NDMA in ranitidine, there were no non-preempted actions Generic Defendants could have *independently* taken to ensure that consumers received, in Plaintiff's view, a safe product. *Mensing* and *Bartlett* foreclosed issuing a cancer warning, changing chemical design, or stopping sales. And Plaintiffs have not cited to any Kansas or Texas authority that the duty to test can be met through third parties. Thus, *Erie* forecloses this Court from endorsing that theory. This claim is preempted, too.

## IV. Federal Law Also Preempts Plaintiff's Failure-to-Warn-Through-the-FDA Claim

Lastly, Plaintiffs claim that even though federal law prohibited Generic Defendants from warning them about the dangers of ranitidine directly, they violated state law by failing to indirectly warn consumers about those same dangers through the FDA. The district court correctly concluded that this claim is also preempted by federal law. MDL.Dkt.3422:20–22.

This Court has made it clear that even if there is a cognizable state law cause of action for a failure to warn FDA, such a claim nonetheless arises entirely out of FDA reporting obligations and as such is preempted under *Buckman*. In *Mink v. Smith & Nephew, Inc.*, this Court addressed a traditional state-law negligence claim brought against a medical device manufacturer that was based, in part, on a theory for "failure to report adverse events" to FDA. 860 F.3d 1319, 1329–30 (11th Cir. 2017). As in *Mink*, Plaintiffs' claims here are based on an alleged failure to submit

55

product safety information to FDA, including adverse event reports required by *federal* regulations.    *See* MDL.Dkt.2759¶¶438–45,1390–1405(citing 21 C.F.R. §§ 314.80, 314.81(b)(2)).

Moreover, as the district court correctly held, just like the claim in *Mink*, the claim here is "very much" like the claim in *Buckman*.  MDL.Dkt.3715:43–45. Under *Buckman*, a state-law duty to disclose information to FDA will "inevitably conflict" with federal law, which grants FDA the sole authority to *act* on those disclosures, and only in its discretionary "judgment."  *See Buckman*, 530 U.S. at 350.  Thus, the claim is preempted under *Mink* and *Buckman*.

Since *Mink* was decided, this Court has affirmed the dismissal of failure to report adverse event claims brought against a brand-name drug manufacturer.  *See Tsavaris v. Pfizer, Inc.*, 717 F. App'x 874, 877 (11th Cir. 2017).  Multiple district courts within the Circuit likewise have dismissed similar claims. *E.g.*, MDL.Dkt.3715:42–43 (collecting cases).

The district court's decision is also supported by *Mensing*, where the Supreme Court rejected the notion that preemption could be evaded by seeking FDA's assistance to issue a warning.  As pleaded, Plaintiffs' claim is based entirely on a "duty to warn Plaintiffs of dangers associated with ranitidine."  *See* MDL.Dkt.2759¶1379; *see also id*. ¶1408.    In *Mensing*, the Supreme Court considered tort causes of action based on the exact same traditional failure to warn

principles.  *See Mensing*, 564 U.S. at 611.  It recognized that the generic manufacturers "could have asked the FDA for help" in issuing a warning, which "might" have led the agency to decide to issue a warning.  *Id.* at 620.  But the theory necessarily involves the FDA's discretionary "exercise of judgment" as to whether to issue a warning, as opposed to actions the manufacturers can "independently" take.  *Id.* at 620–21, 623–24.  The "conjectures" about what FDA might do did not "prevent federal and state law from conflicting for Supremacy Clause purposes," and did not save warning claims from preemption.  *Id.* at 621.

In sum, *Mink, Buckman*, and *Mensing* foreclose Plaintiffs' argument. Plaintiffs' Failure to Warn through the FDA claim is preempted.

## <u>CONCLUSION</u>

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Thomas J. Yoo*
Thomas J. Yoo
Amy McVeigh
Daniel Winters
**HOLLAND & KNIGHT LLP**
400 South Hope Street, 8th Floor
Los Angeles, CA 90071

*Counsel for Glenmark
Pharmaceuticals USA Inc.*

57

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Generic Defendants-Appellees certifies that this Answering Brief complies with Rule 32(a)(7)(B) and includes 12,984 words as calculated by the word processing program.

/s/ Thomas J. Yoo
Attorney

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of July, 2024 the foregoing Answering Brief has been electronically filed using the ECF filing system which will send notice of electronic filing to all counsel of record.

<u>/s/ Thomas J. Yoo</u>
Attorney